James E. Cecchi
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

*Attorneys for Lead Plaintiff Bin Qu*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAO SUN, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>            v.<br><br>DAQING HAN, XIAOLI YU, HONG LI, MING LI, LIAN ZHU, GUANGHUI CHENG, GUOBIN PAN, GUANGJUN LU, YUANPIN HE, MAZARS CPA LIMITED, MAZARS Scrl, WEISERMAZARS LLP, and TELESTONE TECHNOLOGIES CORPORATION<br><br>                                    Defendants. | Civil Action No. 2:15-cv-00703-JLL-JAD<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <u>AND DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ........................................................................1

II.  JURISDICTION AND VENUE ................................................................5

III.  PARTIES ..................................................................................................6

IV.  BACKGROUND ....................................................................................12

    A.  Telestone Becomes Listed on a U.S. Exchange Through a Reverse Merger ........13

    B.  Defendants' Communications with the SEC During the Class Period .................17

V.  DEFENDANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED GAAP BY IMPROPERLY RECOGNIZING REVENUE ..................................................42

    A.  Obligations Imposed by the Securities Laws and U.S. GAAP ............................42

    B.  The Company Systematically Violated Its Own Revenue Recognition Policy as Well as GAAP Revenue Recognition Principles ...........................................43

    C.  The Company's Knowingly and/or Recklessly Improper Recognition of Revenue Related for "Sales" to the Big 3 Where the Sales Contracts Were Not Substantive, the Sales Price Was Not Fixed or Determinable, and Collectability Was Not Reasonably Assured .........................................................45

        1.  Telestone Improperly Recognized Revenue Even Though There Was Not Persuasive Evidence of a Substantive Arrangement .........................45

        2.  Telestone Improperly Recognized Revenue Even Though the Sales Price Was Not Fixed or Determinable .......................................46

        3.  Telestone Improperly Recognized Revenue When Collectability Was Not Reasonably Assured .......................................48

    D.  Telestone's Additional GAAP Violations ...........................................50

VI.  TELESTONE'S KNOWINGLY AND/OR RECKLESSLY FALSE AND/OR MISLEADING FINANCIAL STATEMENTS DURING THE CLASS PERIOD ..........52

    A.  Financial Misstatements in the Company's 2009 Fiscal Year Financial Results ..54

    B.  Financial Misstatements in the Company's 2010 Fiscal First Quarter Financial Results ..................................................................54

C.    Financial Misstatements in the Company's 2010 Fiscal Second Quarter  Financial Results .................................................................................................55

D.    Financial Misstatements in the Company's 2010 Fiscal Third Quarter Financial Results .................................................................................................56

E.    Financial Misstatements in the Company's 2010 Fiscal Year and Fiscal Fourth Quarter Financial Results .......................................................................56

F.    Financial Misstatements in the Company's 2011 Fiscal First Quarter Financial Results .................................................................................................57

G.    Financial Misstatements in the Company's 2011 Fiscal Second Quarter  Financial Results .................................................................................................58

H.    Financial Misstatements in the Company's 2011 Fiscal Third Quarter Financial Results .................................................................................................59

I.    Financial Misstatements in the Company's 2011 Fiscal Year and Fiscal Fourth Quarter Financial Results .......................................................................59

J.    Financial Misstatements in the Company's 2012 Fiscal First Quarter Financial Results .................................................................................................60

K.    Financial Misstatements in the Company's 2012 Fiscal Second Quarter  Financial Results .................................................................................................61

L.    Financial Misstatements in the Company's 2012 Fiscal Third Quarter Financial Results .................................................................................................62

VII.    MATERIALLY    FALSE    AND    MISLEADING    SARBANES-OXLEY CERTIFICATIONS .......................................................................................................62

VIII.    MAZARS' FALSE AND MISLEADING AUDIT REPORTS.......................................64

IX.    LOSS CAUSATION AND STATEMENTS ISSUED AT THE END OF THE CLASS  PERIOD...............................................................................................................70

X.    ADDITIONAL SCIENTER ALLEGATIONS................................................................73

A.    Telestone Removes Its United States Based Auditor and Rehires Its Chinese  Based Auditor Just Prior to the Start of the Class Period .................................73

B.    The Magnitude of the Transactions at Issue ......................................................75

C.    The Lack of Adequate Sales Records and Refusal to Supply Its Sales Contracts .75

XI.     CLASS ACTION ALLEGATIONS ................................................................76

XII.    UNDISCLOSED ADVERSE FACTS...........................................................78

XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...............................................................................79

XIV.    NO SAFE HARBOR .......................................................................................81

XV.     COUNTS..........................................................................................................81

XVI.    PRAYER FOR RELIEF ...................................................................................86

JURY TRIAL DEMAND ...........................................................................................87

Lead Plaintiff Bin Qu ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based on, among other things, his counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Telestone Technologies Corporation ("Telestone" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued by and disseminated by the Company; and (c) a review of other publicly available information concerning the Company.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of a class consisting of all those who purchased Telestone securities between March 31, 2010 and April 16, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    This case is quite straightforward: Defendants[1] engaged in securities fraud by issuing inflated financial results containing revenues that should have never been recognized.  Defendants represented to the public dramatic revenue from sales of its products in the People's Republic of China, while in reality, payment on these were not reasonably assured and Telestone had no recourse if its customers did not pay for the goods and services provided.  Immediately recognizing revenue upon delivery of its goods and services while knowing payment was not reasonably assured clearly violates the Generally Accepted Accounting Principles ("GAAP"), SEC accounting guidelines and Telestone's own stated revenue recognition policy. Not surprisingly, the SEC ultimately determined

---

[1] Defendants refer to Daqing Han, Xiaoli Yu, Hong Li, Ming Li, Lian Zhu, Guanghui Cheng, Guobin Pan, Guangjun Lu, Yuanpin He, Mazars CPA Limited, Mazars Scrl, WeiserMazars LLP, and Telestone.

that the Company needed to file a Current Report on Form 8-K announcing that certain of their previously issued financial statements should no longer be relied on and to amend certain of its financial statements.

3.     Telestone purports to be a leading access-network solution provider for communication networks in China. According to the Company, it provides solutions to the telecommunications industry that cover indoor and outdoor environments, including hotels, residential estates, office buildings, airports, exhibition centers, underground stations, highways and tunnels.

4.     The telecommunications industry in China is dominated by three state-run businesses: China Telecom, China Unicom and China Mobile.  These three entities, referred to as the Big 3, award contracts through competitive bidding.  Due to the Big 3's industry dominance, Telestone has admittedly limited negotiating leverage with these key clients in the bidding process.  During the Class Period, however, almost all of the Company's purported revenue was derived from business with the Big 3.  In fact, Telestone disclosed that 99% of the Company's revenues for its 2010 fiscal year came from the Big 3 and that in both the 2011 and 2012 fiscal years, the Big 3 accounted for over 95% of Telestone's annual revenue.

5.     Telestone's practice throughout the Class Period was to immediately recognize revenue upon the delivery of goods and services to the Big 3.  This practice, however, ignored that the Big 3 refused to honor the terms of the contract by not paying Telestone or by paying the Company years later at their own discretion.  Moreover, due to  the Big 3's monopoly position and governmental states, Telestone admittedly was unable to do anything about this non-payment, refusing to demand payment or to seek legal recourse against these customers.

6.      In order recognize revenue, GAAP requires "persuasive evidence of an arrangement exists," "the seller's price to the buyer is fixed or determinable," and "collectability is reasonably assured;" if not, recognizing revenue is inappropriate. As such, recognizing revenue on these transactions with the Big 3 was a clear GAAP violation.

7.      In spite of these undisputed facts, Defendants repeatedly represented to the SEC in a series of communications that its recognition of revenue was proper.  Regardless of Defendants' claims, in reality, Telestone was not being paid for its goods and services, and that payment, if any, was completely at the discretion of the Big 3.

8.      Illustrating the Company's inability to collect reported revenue is its 2010 and 2011 collection rates: in each of these years Telestone collected only 16% and 14% of amounts due, respectively.  Yet, Defendants allowed Telestone to continue to recognize this "revenue," even as its accounts receivables ballooned to staggering amounts.  For example, at the end of 2009, Telestone's accounts receivables were $62.1 million; by the end of 2011, the Company had accounts receivable of over $192.4 million.

9.      Similarly, due to the Big 3's non-payment, there was a significant increase in Telestone's Days Sales Outstanding ("DSOs") , a representation of the number of days there has not been payment on sales.  For example, the Company's DSOs almost doubled in 2011, and then almost doubled again in the first two quarters of 2012:

|  | *2009* | *2010* | *2011* | *2012Q1* | *2012Q2* |
|---|---|---|---|---|---|
| DSOs | 358 | 355 | 690 | 1,291 | 1,232 |

10.      In spite of the clear evidence of Telestone's customers not honoring its purported contracts with the Company, Telestone's auditors simply buried their heads in the sand and rubber-stamped the Company's conclusions regarding the propriety of its revenue recognition policy.  In

fact, even after the SEC had clearly articulated that the Company's revenue recognition was improper, and Telestone should only be accounting for revenues on the basis of cash received, the Company's auditors maintained their position that, even though, on average, customers had not paid for goods and services for four years, payment was still reasonably assured.

11.     As the hollowness of Telestone's financial results began to be disclosed to the public, the price of the Company's stock deteriorated.  For example, on May 15, 2012, the Company disclosed that Telestone's accounts receivable was $256.5 million, that the accounts receivable turnover period, or DSOs, had increased to 1,291 days, and that during the quarter, Telestone had only collected $14 million in accounts receivable.  On this news, shares of Telestone declined $0.47 per share, 18.95%, to close on May 15, 2012 at $2.01 per share, on unusually heavy volume.

12.     On August 14, 2012, the Company disclosed that Telestone's accounts receivable had even further increased to $259.5 million from $256.5 million in the prior quarter.  On  this  news, shares of Telestone declined $0.12 per share, 8.51%, to close on August 14, 2012 at $1.29 per share, on heavy volume.

13.     On November 19, 2012,  the Company disclosed that Telestone's  accounts receivable was $243.9 million, that DSOs were 1,232 days, and that during the quarter Telestone had only collected $18.5 million in accounts receivable.  On this news, shares of Telestone declined $0.24 per share, 14.81%, to close on November 19, 2012 at $1.38 per share, on unusually heavy volume.

14.     Finally, on April 17, 2013, the Company disclosed that it was not able to file its annual report since it was unable to obtain financial records from one of its subsidiaries. On this news, the NASDAQ halted trading in Telestone's securities. Subsequently, NASDAQ struck Telestone's listing. When Telestone's shares resumed trading on the over-the-counter market on

June 3, 2013, the Company's stock price declined $0.54 per share, over 64%, to close on June 3, 2013 at $0.30 per share, on unusually heavy volume.

15.     Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's securities.   Plaintiff and other Class members have suffered significant losses and damages at the hands of Defendants and are entitled to redress.

## II.     JURISDICTION AND VENUE

16.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

20.    Lead Plaintiff Bin Qu purchased Telestone securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.    Defendant Telestone is a Delaware corporation that traded on the NASDAQ Stock Market ("NASDAQ").  Telestone's principal executive offices were situated at Floor 6, Saiou Plaza, No. 5 Haiying Road, Fengtai Technology Park, Beijing, China 100070, until approximately November 5, 2010, when the Company relocated its executive offices to Floor 10, Ruida Plaza, No. 74 Lugu Road, Shi Jingshan District, Beijing, People's Republic of China 100040.  During the Class Period, Telestone, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

22.    Defendant Daqing Han ("Han") was, at all relevant times, Chief Executive Officer ("CEO"), Chairman of Telestone's Board of Directors (the "Board") and a director of Telestone. Defendant Han was a director of Telestone since its inception in October 1997 and its CEO since January 2002.  Defendant Han also served as President of Telestone from August 23, 2004 to May 2010 and served as its Acting Chief Technology Officer since July 2, 2008. Defendant Han also served as President of Milestone Capital, Inc. since August 23, 2004 and served as its Chief Executive Officer.  From 1996 to 2002, Defendant Han was the Chief Representative of the Beijing Office of Allgon Systems AB, an international telecommunications conglomerate. Defendant Han holds a Bachelor's degree in Computer Engineering and a Master's degree in Digital Communication Engineering, both from the Xidian University of Electronic Science & Technology. Additionally, Defendant Han holds a Master's of Business Administration from CITY University.

23.     Defendant Xiaoli Yu ("Yu") was, at all relevant times, Chief Financial Officer ("CFO") of Telestone since May 11, 2010.  Since January 2009, Defendant Yu also has served as the Company's Financial Controller where she was the assistant to the former CFO and provided oversight on audits and financial reports, and reported directly to the Company's CEO on matters of internal management.  Additionally, Defendant Yu headed the Company's Yunnan branch office from April to December 2008, and from September 2005 to March 2008, Defendant Yu was the accounting manager of the Company's equipment business. From May 2001 to August 2005, Defendant Yu was Treasurer of the Company, and from September 1999 to May 2001, she served as a staff accountant of the Company.  Defendant Yu holds a Bachelor's degree in Accounting from Dongbei University of Finance and Economics in China.

24.     Defendant Hong Li ("H. Li") was, at all relevant times, CFO of Telestone until May 11, 2010.  Prior to serving as Telestone's CFO, Defendant H. Li  had over 13 years of senior management experience in accounting, auditing, financial analysis and reporting for both public and private companies in China.  From January 2002  to June 2008, Defendant H. Li  served as the CFO at Beijing Suburb Telecommunication Industry Co., Ltd., where she played a leading role in the company's management, accounting and audit control, and tax reporting.  Defendant H. Li holds a Master's degree in Accounting from Central University of Finance and Economics, China and a Bachelor's degree in Accounting from Hefei Economics and Technology University, China.

25.     Defendant Ming Li ("M. Li") was, at all relevant times, a director of Telestone from April 29, 2010 until December 20, 2011.  Defendant M. Li had over 16 years working experience in senior management with the Hi-Tech Wealth Group.  From 2005 to 2010, Defendant M. Li served as the CEO of the Beihai Hi-Tech Wealth Technology Development Co., Ltd., and she served as its President from 2003 to 2005.  Defendant M. Li was one of the founders of the HTW Group and from

1998 to 2003 she served as the general manager of the Hong Kong and Shenzhen branches of the HTW Group.  Defendant M. Li holds a Bachelor's degree from the College of PLA in Anti-chemical Command Engineering and a Master's Degree in business administration from Murdoch University.

26.     Defendant Lian Zhu ("Zhu") was, at all relevant times, a director of Telestone from August 23, 2004 until December 20, 2011.  Defendant Zhu also served as a director and the Deputy General Manager of Tianjin-Golik-The First Steel Wire Rope Co., Ltd., where he was responsible for finance and accounting functions.  Prior to taking that position, Defendant Zhu was the Chief Financial Officer of various large public companies including Sparkice E-Commerce Ltd. (2001-2002); Beijing Sanitary Ware, Ltd. (2000-2001); and Eagle Brand Holding Ltd. (2000).  Defendant Zhu holds Bachelor's and Master's degrees in mechanics from Tsinghua University.  Additionally, Defendant Zhu holds a Master's of business administration from the University of Illinois-Chicago and a Master's degree in accounting from the University of Illinois-Chicago.

27.     Defendant Guanghui Cheng ("Cheng") was, at all relevant times, a director of Telestone since September 2007.  During the Class Period, Defendant Cheng was a member of the Audit Committee of the Board of Directors.  Additionally, Defendant Cheng was a director of the China Quality Management Association for Electronics Industry.  From 1998 to 2004, Defendant Cheng worked as a director of the General Office of Ministry of Information Industry of the People's Republic of China.  From 1993 to 1998, Defendant Cheng was a director of the General Office of Ministry of Electronics Industry of the People's Republic of China.  Defendant Cheng holds a bachelor's degree from Tsinghua University.

28.     Defendant Guobin Pan ("Pan") was, at all relevant times, President of Telestone since May 26, 2010, and a director of Telestone since December 28, 2009.  Defendant Pan was appointed Vice President of the Company in August 2007. From November 2001 to August 2007, Defendant

Pan served as the manager of Tianjin Branch and Northeast District Branch of the Company. From August 1985 to October 2001, Defendant Pan worked as an engineer and then served as a product manager at Tianjin Photoelectricity 754 Factory. Defendant Pan holds a Bachelor's degree in Computer Application from Xidian University, China.

29.     Defendant Guangjun Lu ("Lu") was, at all relevant times, a director of Telestone since December 20, 2011. Defendant Lu has served as the Secretary of the Association of China Communication Industry since June 2010, and from September 2006 to April 2010, he was the Chairman of the Board of China Rida System & Equipment Corp. From July 2000 to September 2006, Defendant Lu worked as President and Chief Secretary of China TongGuang Electronic Corporation, and he served as President of China TongGuang Electronic Corporation from October 1996 to June 2000.

30.     Defendant Yuanping He ("He") was, at all relevant times, a director of Telestone since December 20, 2011. Since June 2007, Defendant He has been a director, Vice President, CFO and Secretary of the Board of Directors of Beijing Origin Water Technology Company. From September 2005 to June 2007, Defendant He was Executive Vice President and CFO of Beijing Science and Technology Development Company. From April 2003 to August 2005, Defendant He worked as Vice President and Chief Investment Officer at Beijing Anlian Investment Co., Ltd. Defendant He holds a Bachelor's degree in Engineering from Nanjing University of Science, a Master's degree in Engineering from University of Science and Technology Beijing, and a Master's degree in Finance from Victoria University in New Zealand.

31.     Defendants Han, Yu, H. Li, M. Li, Zhu, Cheng, Pan, Lu and He are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

Telestone's reports to the SEC, press releases and public presentations to securities analysts, money and portfolio managers and institutional investors.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were "group-published" information, the result of the collective actions of the Individual Defendants.

32.     Defendant Mazars Scrl ("Mazars (World)"), a Belgian partnership, is an integrated international partnership with 13,800 members led by about 750 partners.  Defendant Mazars (World) is made up of various national-level entities and it is funded through contributions from its partners.  Mazars (World) creates consolidated financial statements, which are approved by its Group Executive Board.  Mazars (World) licenses or authorizes audit procedures or manuals or related materials, or the use of a name in connection with the provision of audit services or accounting services.  Mazars (World) also has a Group Governance Council.

33.     Defendant Mazars CPA Ltd. ("Mazars (Hong Kong)") is Mazars (World) national-level entity in Hong Kong.  A Mazars (Hong Kong) Partner sits on the Mazars (World) Group Governance Council.  Several Mazars (Hong Kong) employees are also Mazars (World) partners.

34.     Defendant WeiserMazars LLP ("Mazars (US)") is a Mazars (World) member firm. Seventy-four Mazars (US) partners are also partners of Mazars (World).  Mazars (US) has a New Jersey office.  Mazars (US) partner James Blake is a citizen of New Jersey.

35.     Collectively, Mazars (World), Mazars (Hong Kong), and Mazars (US) are referred to herein as "Mazars" or the "Auditors."

36.     During the Class Period, Defendants participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic reports with the SEC, including:

- The press release attached to the Form 8-K filed with the SEC on April 6, 2010 ("2009 Form 8-K"), and Form 10-K filed with the SEC on March 31, 2010 ("2009 Form 10-K");

- The press release attached to the Form 8-K filed with the SEC on May 18, 2010 ("Q1 2010 Form 8-K"), and Form 10-Q filed with the SEC on May 17, 2010 ("Q1 2010 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on August 16, 2010 ("Q2 2010 Form 8-K"), and Form 10-Q filed with the SEC on August 12, 2010 ("Q2 2010 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on November 19, 2010 ("Q3 2010 Form 8-K"), and Form 10-Q filed with the SEC on November 15, 2010 ("Q3 2010 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on March 31, 2011 ("2010 Form 8-K"), and Form 10-Q filed with the SEC on March 30, 2011 ("2010 Form 10-K");

- The press release attached to the Form 8-K filed with the SEC on May 20, 2011 ("Q1 2011 Form 8-K"), and Form 10-Q filed with the SEC on May 16, 2011 ("Q1 2011 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on August 19, 2011 ("Q2 2011 Form 8-K"), and Form 10-Q filed with the SEC on August 15, 2011 ("Q2 2011 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on November 18, 2011 ("Q3 2011 Form 8-K"), and Form 10-Q filed with the SEC on November 21, 2011 ("Q3 2011 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on April 5, 2012 ("2011 Form 8-K"), and Form 10-K filed with the SEC on March 30, 2012 ("2011 Form 10-K");

- The press release attached to the Form 8-K filed with the SEC on May 17, 2012 ("Q1 2012 Form 8-K"), and Form 10-Q filed with the SEC on May 21, 2012 ("Q1 2012 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on August 20, 2012 ("Q2 2012 Form 8-K"), and Form 10-Q filed with the SEC on August 14, 2012 ("Q2 2012 Form 10-Q"); and

- The press release attached to the Form 8-K filed with the SEC on November 21, 2012 ("Q3 2012 Form 8-K"), and Form 10-Q filed with the SEC on November 19, 2012 ("Q3 2012 Form 10-Q").

## IV.   BACKGROUND

37.     Telestone purports to be a leading access-network solution provider for communication networks in China.  Telestone's access-network solutions include the research and development and application of access-network technology.   In addition to the Company's homegrown access-network equipment, which includes repeaters, antennas and radio-frequency peripherals, Telestone also offers project design, project management, installation, maintenance and other after-sales services required by customers.   Telestone's access-network solutions are created to further enhance the coverage of mobile telecommunications networks; this is done to improve the quality of reception for mobile phone users.  According to the Company, it provides solutions to the telecommunications industry that cover indoor and outdoor environments, including hotels, residential estates, office buildings, airports, exhibition centers, underground stations, highways and tunnels.

38.     Telestone provides electronic equipment used to provide access-network solutions to its customers. Many of these types of equipment, including WFDS™ (Wireless Fiber Distribution System) products, RFPA products, passive components and base station antenna for 2G, 3G, Broadband access and CATV (cable television) networks, are highly specialized active microwave components designed to meet the needs of its customers.

39.     In addition to designing and selling products, Telestone also provides system integration services for its customers. The primary system integration services provided are project design and engineering, specifically, the development and design of indoor (living quarters, hospital systems, and hotels) and outdoor (expressways, railways and no coverage zones) wireless signal complementary coverage solutions and their applied products. This includes the design of the required equipment, implementation, project quality evaluation, as well as after-sale maintenance and optimization for system integration products, constructive products for engineering design projects, and wireless network optimization products.

**A.     Telestone Becomes Listed on a U.S. Exchange Through a Reverse Merger**

40.     Telestone did not become a publicly traded company through an initial public offering ("IPO").  Instead, it became listed on the NASDAQ through the use of a so-called reverse merger or reverse take-over ("RTO"), with Milestone Capital, Inc., a company that had previously declared bankruptcy and had all of its assets, which primarily consisted of mortgage origination software and other related intellectual property to Crystal Pond Capital Partners, sold through the bankruptcy process for $500,000.  As Millstone Capital, Inc. explained in a September 16, 2004 filing with the SEC, "The Company's plan of operation is to be acquired through a reverse acquisition and become the operating registrant.  This acquisition became effective in August 2004 and resulted in the Company changing its name to Telestone Technologies Corporation as it was acquired by the Telestone/Success Millions entities."  As explained herein, through this process, Telestone was able to avoid the substantial regulatory scrutiny and disclosure requirements required in an IPO.

41.     The number of China-based companies with their principal places of business in China that are listed on U.S. exchanges has skyrocketed in the past decade.  The Public Company

Accounting Oversight Board ("PCAOB") identified 159 reverse mergers by companies primarily based in China between January 1, 2007, and March 31, 2010.[2]  Not every Chinese company that began to trade on a U.S. stock exchange engaged in fraudulent activity, but a substantial number have.  In fact, as disclosed in an April 27, 2011 letter from Mary Schapiro (then-Chairman of the SEC) to Congressman McHenry (Chairman of the Subcommittee on TARP, Financial Services, and Bailouts of Public and Private Programs), the SEC had identified no fewer than 24 China-based companies that had filed Forms 8-K disclosing auditor resignations, accounting problems, or both, in March and April of 2011 *alone*.

42.     The Chairman of the PCAOB, James R. Doty, stated that there are "significant risks associated with audits of operations of U.S. [listed] companies in China. For example, we are finding through our oversight of U.S. firms that even simple audit maxims, such as maintaining the auditor's control over bank confirmations, may not hold given the business culture in China." Therefore, Doty concluded that "[i]n light of these risks, the PCAOB's inability to inspect the work of registered firms from China is a gaping hole in investor protection."[3]

43.     The reverse merger is the technique *du jour* for fraudulent companies to bypass the typical registration process that allows the SEC to examine a company prior to it selling shares on U.S. stock exchanges.  In a typical registration process for an IPO, a Company submits its registration statement to the SEC's Division of Corporate Finance where it undergoes a rigorous examination process, which often includes detailed questions from the SEC about the company's

---

[2] Research Note 2011-P1, *Activity Summary and Audit Implications for Reverse Mergers Involving Companies from the China Region: January 1, 2007, through March 31, 2010*, Public Company Accounting Oversight Board (March 14, 2011).

[3] *Testimony Concerning the Role of the Accounting Profession In Preventing Another Financial Crisis: Hearing Before the Subcommittee on Securities, Insurance, and Investment of the Senate Committee on Banking, Housing and Urban Affairs*, 112th Cong. (2011) (statement of James Doty, Chairman, PCAOB), *available at* http://www.sec.gov/news/testimony/2011/ts040611jlk.htm.

disclosures.  In a reverse merger, however, a private operating company based in China is "acquired" by a previously registered U.S.-based publicly traded "shell company," thereby bypassing the rigorous IPO registration process as described by the WALL STREET JOURNAL:

> In reverse mergers, a foreign company is "bought" by a publicly traded U.S. shell company. But the foreign company assumes control and gets the shell's U.S. listing without the level of scrutiny that an initial public offering entails. Though companies from other countries also engage in reverse mergers, such deals are especially common among the Chinese. The PCAOB says nearly three-quarters of the 215 Chinese companies listing in the U.S. from 2007 to early 2010 did so via reverse merger.[4]

44.     This loophole has allowed numerous unscrupulous foreign companies to avoid SEC scrutiny.  A large number of shady stock promoters in recent years have come from China.  In May 2011, there were 19 stocks in which the NASDAQ had halted trading; an astonishing 15 of these 19 companies were China-based.  Reporters have blamed inadequate auditing procedures by both Chinese and U.S. auditing firms for this disturbing trend.  The WALL STREET JOURNAL revealed in June of 2011, that the SEC had begun examining accounting and disclosure issues regarding Chinese companies that had engaged in reverse mergers.[5]  The SEC's investigation specifically targets the work of Chinese auditors:

> People familiar with the matter say the investigation also includes auditors, which hadn't previously been known. As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations.
>
> The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.

*        *        *

---

[4] Michael Rappaport, *SEC Probes China Auditors*, WALL STREET JOURNAL (June 3, 2011).

[5] *Id.*

"Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guanghua School of Management.

\*      \*      \*

Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.[6]

45.      Additionally, according to the article, although some auditors say, in response, that they are "intensifying their efforts" and "doing everything they can to perform strong audits," that simply "may raise questions about whether their past efforts were strong enough."[7]

46.      SEC Commissioner Luis A. Aguilar has also spoken out on the subject. In a speech on April 4, 2011, he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend."  He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud."  The "billions in U.S. savings and investment dollars [that] have been entrusted with these companies" are therefore at risk.

47.      A May 26, 2011 article in THE NEW YORK TIMES[8] blamed auditors and inadequate audit procedures for this disturbing trend. This article revealed that another Chinese corporation, Longtop Financial Technologies – not an RTO merger entry into U.S. capital markets – also recently became "worthless" when, after six years, its auditors sought bank confirmations from Longtop's bank's headquarters rather than the local branches of which it had inquired in years past.  Longtop stopped the confirmation process and, ultimately, admitted to having fraudulent cash balances in Chinese banks and on the books.

---

[6] *Id.*

[7] *Id.*

[8] Floyd Norris, *The Audacity of Chinese Frauds*, THE NEW YORK TIMES (May 26, 2011).

48.     The May 26, 2011 article described how Longtop attempted to deflect criticism by relying upon its clean audit opinions:

> On April 28, the company tried to assure analysts that the fraud claims were bogus. Derek Palaschuk, a Canadian accountant who served as the company's chief financial officer, wrapped himself in Deloitte's prestige, saying that those who questioned Longtop were "criticizing the integrity of one of the top accounting firms in the world."
>
> "For me," he said, "the most important relations I have other than with my family, my C.E.O., and then the next on the list is Deloitte as our auditor, because their trust and support is extremely important."[9]

The article then explained, however, that the major auditing firms in China are not subject to the same type of inspections required of other accounting firms that audit companies whose securities are traded in the U.S.:

> The Chinese audit firms, while they are affiliated with major international audit networks, have never been inspected by the Public Company Accounting Oversight Board in the United States. The Sarbanes-Oxley Act requires those inspections for accounting firms that audit companies whose securities trade in the United States, but China has refused to allow inspections.
>
> In a speech at a Baruch College conference earlier this month, James R. Doty, chairman of the accounting oversight board, called on the major firms to improve preventative global quality controls but said that actual inspections were needed.
>
> Two weeks ago, Chinese and American officials meeting in Washington said they would try to reach agreement on the oversight of accounting firms providing audit services for public companies in the two countries, so as to enhance mutual trust.

**B.      Defendants' Communications with the SEC During the Class Period**

49.     During the Class Period, Telestone's accounting policies and practices were scrutinized by the SEC in a series of written communications to the Company. These communications, in which the SEC repeatedly informs Defendants that its accounting practices are not in accordance with GAAP, demonstrate that during the Class Period, Telestone failed to comply with GAAP and should have recognized revenue on a cash basis (*i.e.* Telestone should have only

---

[9] *Id.*

recognized revenue upon actual payment).  Not surprisingly, the SEC ultimately determined that the Company should file an 8-K announcing that certain of their previously issued financial statements should no longer be relied on.

50.     On November 9, 2012, Telestone submitted a letter to the SEC, signed by Defendant Han, in response to an SEC comment letter, dated September 24, 2012, regarding Telestone's 2011 Form 10-K.  Therein, Telestone provided the following response, in relevant part, to the SEC comment letter:[10]

> *2.     We note from the last paragraph of page F-26 that as a matter of general practice you do not bill, invoice that is, your consumers until after you receive payment from them for services and goods provided. In this regard, explain to us how and when you determine that collectability is reasonably assured during the course of the business cycle for your completed contract revenues in accordance with your US GAAP revenue recognition policies.*
>
> **Response:**
>
> ***
>
> ***The vast majority of Telestone's revenues (together amounting to 95.4% of revenues in 2011) were derived from three large, State-owned Chinese telecom carriers—China Mobile, China Unicom, and China Telecom—which are supported by the government of the People's Republic of China.***
>
> ***Due to the creditworthiness of our customers, the management believes that there is no significant risk on collectability of accounts receivables as long as the services and the goods are accepted by the customers. Accordingly, Telestone recognizes revenue once the conditions mentioned above have been met (as collectability is considered probable once the goods/services are delivered/performed and accepted by the customers).***
>
> *3.     We note your disclosure in the fourth paragraph of page 34 stating that "implementation of most of our projects are integrated and project payment is determined by achieving certain milestones in the engineering stage". However, in your revenue recognition policy on page F-8 you disclose that you use the completed contract method because the contract is completed within a short period of time. In this regard, please provide us with a detailed explanation of the nature of the contracts and your basis in GAAP for the timing of your revenue recognition.*

---

[10] The comments from the SEC comment letter, dated September 24, 2012, which were reproduced in Telestone's November 9, 2012 response are italized.

**Response:**

*The "milestones'' in the question are when the project is accepted by the carriers (at which point the project becomes payable – though actual receipt of payment typically occurs much later). However, the time to actually implement a project once a contract has been signed and construction process is relatively fast (which is the meaning of the second statement that contracts are completed in a short amount of time). According to the provisions of U.S. GAAP, and as further discussed in the response to Comment 1 above, Telestone recognizes revenue at the point that the customer accepts the completion of the project within a signed contract.*

Note 5. Accounts Receivable, Page F-15

*4.        We note that your accounts receivable turnover period of 1232 days for the three months ended June 30, 2012 has lengthened considerably from your accounts receivable turnover period of 690 days for the year ended December 31, 2011. We also note in the fourth paragraph of page 34, your disclosure stating that once a contract is signed, you receive 60-70% of your receivables within 4 to 9 months and another 20-30% in 9 to 12 months. In this regard, clarify for us in detail why you have such a significant account receivable balance. Also, give us an analysis for each annual and interim reporting period in your most recent Forms 10-K and 10-Q reconciling the movement in your trade accounts receivable. In this regard tell us the amounts of credit sales, collections and other charges made to your accounts receivable during those reporting periods. Quantify the impact of your "WFDS" sales and collections on the movement in your accounts receivables during this time table.*

**Response:**

According to the formula of DSO as below:

Quarter (Opening Accounts receivable, net+ net accounts receivable at the end)/2*90/(equipment revenue*1.17+service revenue)

Year(Opening Accounts receivable, net+ net accounts receivable at the end)/2*360/(equipment revenue*1.17+service revenue)

*DSO has become increasingly long because accounts receivable has continued to increase while current revenue has decreased. Our disclosure stating that once a contract is signed, we receive 60-70% of our receivables within 4 to 9 months and another 20-30% in 9 to 12 months, is based upon the terms as stipulated in our contracts. However, the carriers have their own payment process which is always not in accordance with the terms as stipulated in contracts. That is why our DSO has continued to increase. Because of the absolute monopoly position of big three carriers in China's communications industry, we are unable to exercise significant influence to ask the big three carriers to follow the terms as stipulated in our contracts.* Regarding to the situation above, the Company has adjusted its strategies to focus on new projects such as WFDS and TIPS. That is also the reason why the current revenue has decreased. At the same time, the Company is working to develop business

relationships with new customers. As the new projects continue to mature, we believe that the strategies will help to shorten the DSO.

***The table below contains an analysis of the movements in our accounts receivable:***

| | *2009* | *2010* | *2011* | *2012Q1* | *2012Q2* |
|---|---|---|---|---|---|
| *Opening receivables, gross* | *67,912* | *95,179* | *200,350* | *267,779* | *272,826* |
| *Opening receivables, net* | *62,136* | *89,005* | *192,487* | *251,460* | *256,477* |
| *Service revenue* | *41,717* | *66,492* | *69,783* | *13,572* | *11,913* |
| *Equipment revenue (VAT included)* | *35,290* | *76,237* | *45,959* | *4,131* | *6,965* |
| *Receivables collected* | *49,740* | *37,558* | *48,313* | *12,656* | *13,863* |
| *Ending receivables, gross* | *95,179* | *200,350* | *267,779* | *272,826* | *277,841* |
| *Ending receivables, gross* | *89,005* | *192,487* | *251,460* | *256,477* | *259,562* |
| *Increase in receivables* | *27,267* | *105,171* | *67,429* | *5,047* | *5,015* |
| *Increase versus last period* | *40%* | *110%* | *34%* | *2%* | *2%* |
| *DSOs* | *358* | *355* | *690* | *1,291* | *1,232* |

***Monetary figures in '000s**

As observed in the table above, there was a significant increase in DSOs between December 31, 2011 and June 30, 2012. Such increase is mainly due to the use of quarterly figures to compute the second-quarter DSOs versus full-year figures to compute the annual DSO figure. In addition, the difference in these figures is magnified due to the relatively soft seasonal sales in the second quarter versus the full year sales figure, which includes the seasonally strong fourth quarter.

WFDS Impact

In the table below, we see that the percentage of WFDS sales to revenue and of collected receivables has remained relatively steady. The products were launched late in 2009, so the figures in 2009 are not comparable.

| | 2009 | 2010 | 2011 | 2012Q1 and Q2 |
|---|---|---|---|---|
| Sales of WFDS | 1,438 | 36,665 | 29,610 | 7,374 |
| Percent of Revenues | 2.0% | 27.8% | 27.1% | 21.1% |
| WFDS Receivables Collected | 388 | 8,986 | 12,199 | 3,348 |

| Proportion of total receivable collected | 0.8% | 22.9% | 21.5% | 26.4% |
|---|---|---|---|---|

*Monetary figures in '000s

5.      *We note from your letter to the Staff dated October 17, 2008 that your collections of account receivables were delayed due to the restructuring of the Chinese telecom industry. We note that the industry restructuring was then expected to be completed in the middle of 2009. Tell us the impact that the completion of this industry restructuring had on your operations and on your trade accounts receivables collections and whether and how that impact continues.*

**Response:**

In early May 2008, the restructuring of China telecom industry was kicked off with China Mobile's announcement of its merger with China Railway Telecom. Then China Unicom's business was split into two parts, of which, the CDMA network was merged with China Telecom and the remaining GSM network, together with China Netcom, formed a new China Unicom group.

On the surface, after the restructuring of the telecommunications industry, five companies were combined into three companies, however, there were no significant changes in business activities in terms of equipment sales, engineering services and integrated projects. Therefore, our business was not greatly affected. Although business remained the same, the reduction in the number of our major customers was more conducive to centralizing our access to projects and this resulted in rapid growth in sales to China Mobile and China Unicom within two years after the reorganization of the telecommunications industry.

***The influence of the restructuring of China's telecommunications industry on our accounts receivable collection has had positive and negative effects. The restructuring of China's telecommunications industry lasted for more than a year, during which time our clients' capital-spending budgets were not paid according to plan. Thus, clients made the majority of payments in 2009, immediately after the industry restructuring, which improved the collections situation and resulted in substantial growth. However, after China's telecommunications industry restructuring, due to changes in our clients' organizational structures, and the continual adjustment to the payment and approval processes of our clients resulting in such processes becoming increasingly complicated and strict, the level of our DSOs / accounts receivable have been affected.***

6.      *We note your disclosure on page F-15 of the non-current portion of trade accounts receivables retained. In light of the fact that accounts receivable turnover period has exceed 365 days for all reporting periods presented, please explain for us why your non-retention completed contract trade receivables are classified as current assets.*

**Response:**

FASB Codification Master Glossary states that current assets are used to designate cash and other assets or resources commonly identified as those that are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business where the operating cycle is the average time intervening between the acquisition of materials or services and the final cash realization. Current assets include assets that are sold, consumed or realized as part of the normal operating cycle even when they are not expected to be realized within one year after the balance sheet date.

***A substantial portion of our contract sums (except for the retention money as explained below) is payable upon customers' acceptance of products or services and Telestone has the contractual right to demand for payments upon customers' acceptance despite the customers', which mainly consist of the big 3 telecom carriers in China, practice of delaying payments.*** Although such delay in payments by our customers causes the average collection period to exceed 1 year, this would does not affect the classification of our accounts receivable as current assets. In addition, although a small portion of our contract sums (the retention money) for product sales may be due for payment after 1 year as stipulated in the sales contracts, the retention provision is normal in our operations and these retention receivables fall within the normal operating cycle of the Company so they are classified as current assets.

In addition, ASC Subtopic 210-10-45-1c states that current assets include trade accounts, notes, and acceptances receivable. Receivables arising from unusual transactions (such as the sale of capital assets, or loans or advances to affiliates, officers, or employees) that are not expected to be collected within 12 months are excluded from current assets pursuant to ASC Subtopic 210-10-45-4c. As a result, the classification of trade accounts receivable (obviously not arising from unusual transactions) as current assets in the balance sheet is considered appropriate.

(Emphasis added.)

51.     On November 21, 2012, the SEC provided Telestone with a comment letter requesting additional information from the Company.  On December 14, 2012, Telestone submitted a response letter to the SEC, which was signed by Defendant Han.  Therein, Telestone provided the following response, in relevant part, to the November 21, 2012 SEC comment letter:[11]

> Form 10-K
> Item 7. Management's Discussion and Analysis
> Liquidity and Capital Resources, page 33

---

[11] The comments from the SEC comment letter, dated November 21, 2012, which were reproduced in Telestone's December 14, 2012 response, are italized.

1.      *We note that the fourth paragraph of page 34 discloses that you "receive 60%-70% of the contract value" of your signed contracts "within 4-9 months, another 20-30% in 9-12 months and the remainder in 12-24 months" of the date your contracts are signed. This disclosure does not appear to be consistent with your response to comment four of our letter dated September 24, 2012, which explains that the "big three carriers" in China routinely do not honor their contractual obligations with you. It appears as though you do not in fact "receive" the bulk of your collections on your trade receivables as disclosed in MD&A. Please clarify and revise your discussion of liquidity in accordance with Item 303(a)(1) of Regulation S-K to identify the known trends and uncertainties regarding how collections of your trade receivables from your major customers affects your liquidity on a long-term and short-term basis as required by Instruction 5 to item 303(a) of Regulation S-K.*

**<u>Response:</u>**

With respect to the requirements of Item 303(a)(1) and Instruction 5 to Item 303(a), we propose to expand our future disclosures substantially as follows:

1)      Causes of variable liquidity

The Company's main customers' account receivables collection imposes uncertainties on our liquidity. The telecom carriers' constant adjustment of their network construction investment plans and decision-making brings uncertainty to their payment cycles and therefore causes uncertainty in our cash flows. When the payments for our account receivables are used to invest in other projects according to their adjustments, our collections will be affected. Also, the demand for telecommunication network construction has varied greatly depending on the use of 2G, 3G and 4G wireless network technology. Every time our customers decide to build a new network, a large construction investment is arranged, which brings significant business growth to the Company in the corresponding year. However, except for investments in network technology upgrades, the level of carriers' network construction investment is limited to the investment outlined in the normal investment plan within the normal construction period. Since telecom carriers' construction timetables and rates of completion are outside of our control, there is uncertainty regarding the timing of the Company's cash flows. Furthermore, during the past few years, the restructuring of the telecom industry mandated by the Chinese government has had a significant impact on our cash flow, and we cannot guarantee that such restructuring will not happen again. These are the factors we face and which bring uncertainty to our financial results and business trends.

2)      Analysis of the impact of the customers' receivables collection on the Company's short-term operating liquidity

Although the Company has collected a relatively small portion of customers' trade receivables, this is due to the Company's rapid business growth in the past two years, and the resulting rapid accumulation of accounts receivables. The Company collected

US$37,558,000 and US$48,313,000 of trade receivables in 2010 and 2011, respectively, from our customers, which represent an average of US$3,130,000 and US$4,026,000 per month, respectively. Given the Company's current status of its accounts receivables, annual collections should be at least the amounts mentioned above, and we expect their collection to be guaranteed and stable. Moreover, the Company has an annual average bank deposit balance of US$30,000,000, and our accounts receivable pledges at the bank have allowed us to receive a liquidity loan consisting of a US$47,000,000 line of credit from the bank to be drawn upon at any time. To maintain the Company's normal operating activities, we pay an average minimum of US$1,900,000 in expenses every month. In accordance with the above information, there is no short-term liquidity problem caused by late collections.

3)     Analysis of the impact of the customers' receivables collection on the Company's long-term operating liquidity

 In the past two years, the Company's gross profit from integrated projects was approximately 45% and from equipment sales was approximately 42%. Cash paid out for general and administrative expenses and sales and marketing expenses together accounted for approximately 13% of Company's revenue.  The Company's business created long-aged accounts receivable in 2010 and 2011 due to 3G construction, which resulted in average DSO of 522 days and a decrease in the Company's business project net profit margin of 6.5%. The average annual forecast of project profit margins for the turnover period in the normal course of business of the Company is approximately 16.7%. Therefore, even if the accounts receivable turnover period exceeds one year, we can still achieve at least a 10% profit margin from our business.

Pursuant to this calculation, as long as the Company maintains a relatively healthy revenue growth rate and controls the corresponding accounts receivable collection periods, it can still realize reasonable profitability and maintain stable long-term liquidity.

However, the Company is aware of the large amount of accounts receivable caused by rapid business growth in 2009 and 2010 and unexpected customer delays in payment in 2010, 2011 and even 2012. In response, the Company has taken curative and preventative measures such as adopting the terms of the "back to back" principle with a clear statement in our equipment purchase and project installment contracts with our suppliers, which greatly reduces the pressure on the Company's cash expenditures. Moreover, following the first half of 2012, we have controlled the Company's new business investments and have started to adopt various methods in order to accelerate the collection of existing account receivables.  In addition, the Company has strengthened project management and controlled business development in certain regions that tend to have relatively long accounts receivable collection periods. Based on methods currently being pursued, the Company is optimistic that the accounts receivable will be converted into cash flow from collections. Also, in

the foreseeable future, the Company will have sufficient cash flow to ensure its long-term operating stability.

*2.        We note your response to comment two of our letter date September 24, 2012. We note that the three large state owned telecoms provided 95.4% of your revenues in 2011. We also note in your response to comment that you are unable to exercise significant influence to ask the big three carriers in China to follow the terms as stipulated in your contracts. Refer to Item 303(a)(1) of Regulation S-K and expand your discussion of liquidity to identify and to discuss the uncertainties created by your economically dependence of the "big three carriers" in China.*

**Response:**

Substantively, as set forth below, in comment one above, and in our previous responses, in future filings we will expand our disclosures to include additional information related to the issues relating to the big three carriers.

Our dependence on the "Big-3 carriers" will continue to influence our investment in new business as we try to match capital support with investment in business development. We are aware that this dependence has created obstacles to the further development of the Company. As such, the Company, in order to broaden its customer base, has invested in the development of new U-DAS and TIPS solutions and products, which mainly target residential property owners and landlords.

***

Financial Statements
Note 2. Revenue recognition, page F-8

*3.        We note your responses to comments two and four of our letter dated September 24, 2012. Your responses indicate that:*
- *You are unable to ask the big three carriers to follow the terms as stipulated in your contracts with them;*
- *The big three carriers in China do not routinely pay you in accordance with the terms as stipulated in your contracts;*
- *You have only collected approximately 16% and 14% of amounts due in 2010 and 2011 and;*
- *You only invoice these customers after payment is received.*
*In this regard, it is unclear to us how you concluded that persuasive evidence of an arrangement exists. Specifically, tell us in detail why you believe that the terms of the arrangements are substantive considering that your customers routinely do not honor the terms of the arrangements. Tell us in detail why you believe that the fee is fixed or determinable and that collectability is probable considering that you only invoice your customers after payments is received and that you have only collected a small portion of the amounts due. Tell us also of your consideration of whether or*

*not your revenues should be recognized on the installment and/or cost recovery methods in accordance with ASC 605-10-25-3 through 25-5.*

**<u>Response:</u>**

Prices for both integrated services and equipment provided by the Company to the "Big-3 carriers" are determined annually through a centralized bidding process.

For every integrated services project and every equipment sales order, a contract has been signed between the Company and the customer. The prices for each integrated service, each piece of equipment, as well as the total price, are specified in the contract. We consider a duly signed contract as strong evidence that "the fee is fixed and determinable".

***For integrated services, an acceptance document will be signed by the customer after examination of the completion of a project. For equipment sales, an acknowledgement of receipt will be signed by the customers after the receipt and inspection of each batch of equipment that we deliver. In addition, after the acceptance of the integrated service projects and the acknowledgement of receipt of the equipment, no significant expenses would be incurred by the Company and we have substantially discharged our obligations.***

***The acceptance documents and acknowledgement of receipt as well as the contracts as mentioned above are the key documents that we require to record revenue. Since the acceptance documents or acknowledgement of receipt and contracts are signed by our customers' staff on behalf of our customers, the Company has a legal right to demand for payment under the jurisdiction in the PRC.***

***The Company's main customers are the three state-owned telecom carriers in the PRC, and we believe that it is not probable that they are not going to be able to settle our accounts receivable. The timing of the issuance of invoices to customers is solely for the purpose of cash-flow management (to avoid paying value-added tax and enterprise income tax in the PRC in advance of a receipt from customers), which does not in any way indicate that the Company lacks the right or foresees any problem in collecting accounts receivable from customers. Therefore, in view of (1) our legal right to demand payment, and (2) the likelihood that our customers are able to pay us, we consider that "persuasive evidence of the arrangements exists, whose terms are substantive, and whose collectability is probable". In addition, the fact is, in practice, we rarely incur bad debt write-offs.***

Regulation 605-10-25-3 states that "unless the circumstances are such that the collection of the sale price is not reasonably assured, the installment method of recognizing revenue is not acceptable";

Regulation 605-10-25-4 states that, "when receivables are collectible over an extended period of time and, because of the terms of transactions or other conditions, there is no reasonable basis for estimating the degree of collectability, either the installment method or the cost recovery method of accounting may be used."; and

Regulation 605-10-25-5 states that, "In the absence of the circumstances referred to in this Subtopic or other guidance, such as that in Sections 360-20-40 and 360-20-55 the installment method is not acceptable."

As explained above, the collectability of the Company's revenue from integrated services and equipment sales is probable and reasonably assured upon the acceptance of services and the receipt of goods by customers. We conclude that neither the installment method nor the cost recovery method is applicable to the Company.

***

Note 5. Allowance for Doubtful Accounts, page F-10

*5.        We note your response to comment four of our letter dated September 24, 2012. The chart provided in the response suggests that after 2009 you have collected only approximately 14% to 16% of your billed and outstanding gross trade receivables each year. Please provide us with an aging schedule for your accounts receivable as of each balance sheet date beginning with December 31, 2009. For the receivables collected during each period quantify for us the amounts pertaining to service income and to equipment sales. Quantify how much of each year's collections pertained to revenues recorded in the current fiscal year and how much pertained to each prior period.*

**Response:**

Please refer to the following table for the aging schedule of our accounts receivable, as of each balance sheet date from 2010 up to the third quarter of 2012.

***

*7.        We note your response to comment six also states that you have "the contractual right to demand for payment upon customers' acceptance despite (your) customers' ... practice of delaying payments". Given your customers' practice of ignoring your contractual rights in this regard and given your response to comment four indicating that you are unwilling to assert and to enforce those contractual rights tell us why you believe such "contractual right(s) to demand for payment" have economic substance. Further, it is unclear to us how your trade receivable can be reasonably expected to be realized in cash during a normal business cycle per ASC 310-10-20. Please advise and provide us with an analysis of as of each balance sheet date quantifying the amounts of trade receivable outstanding for which your contractual right to timely payment has not been honored.*

*Response:*

We enter into formal contracts which contain the fees for the provision of services and the prices and quantity of equipment sold. There is also definitive signature confirmation from our customers enclosed in the contract that exhibits the services were rendered and the equipment was delivered and accepted by the customers. We think that all of the above factors amount to our having substantive rights to demand customers make payments and that such rights have economic substance. For additional discussion of the economic substance of such contracts and rights thereunder, see our responses to comment 3 above.

(Emphasis added.)

52.     On January 16, 2013, the SEC provided Telestone with a comment letter requesting additional information from the Company.  On February 8, 2013, Telestone submitted a response letter to the SEC, which was signed by Defendant Han.  Therein, Telestone provided the following response, in relevant part, to the January 16, 2013 SEC comment letter:[12]

Item 7. Management's Discussion and Analysis
Liquidity and Capital Resources, page 33

2.     *Your response to comment two of our letter dated November 21, 2012 does not appear to address our concerns about how your economic dependence on the Big-3 carriers adds uncertainty to the collection of your trade-receivables. Please provide us with your proposed revised disclosure in this regard.*

**Response:**

(*1*)     ***As stated in our reply to the first comment letter dated November 21, 2012, the telecom carriers' constant adjustment of their network construction investment plans and their decision-making processes brings uncertainty to their payment cycles and therefore, causes uncertainty in our cash flows. In other words, the funds that the carriers plan to invest in our joint projects may be diverted to other business projects due to changes in their investment decisions. These decisions prevent our trade receivables from being collected on a timely basis and also add uncertainty to the collection period.***

(*2*)     ***Since China's three major carriers account for a majority of the Company's total revenue and trade receivables, the effect of any changes in the carriers' investment plans and funding arrangements can be substantial.***

---

[12] The comments from the SEC comment letter, dated January 16, 2013, which were reproduced in Telestone's February 8, 2013 response, are italized.

*(**3**)     Since most of our revenue is derived from China's three major carriers, we are economically dependent on them and therefore, we have a relatively weak position in our business dealings with the "Big-Three". We are unable to change the Big-Three carriers' project management plans, nor their investment plans, and we have to operate within these constraints. The carriers' actions also intensify the uncertainty of our trade accounts receivable collection period.*

Financial Statements
Note 2. Revenue recognition, page F-8

*3.     We have considered your response to our letters dated September 24, and November 21, 2012. Based upon the history of your business arrangements with your Big-3 carrier customers, your signed formal contracts do not appear to be substantive because they do not document the actual terms for your equipment sales and service revenue arrangements. Therefore it appears that you do not have the necessary evidence of an exchange arrangement as required by SAB Topic 13A1; evidence which must exist in order to determine if your accounting treatment faithfully represents the transaction. Further it appears from the history of your business arrangements with your Big-3 carrier customers that the recoverability of your revenue is not certain. Consequently it appears, given your facts and circumstances, that your revenues should be recognized in accordance with the Cost Recovery Method.*

**Response:**

*(**1**)     Although our customers generally tend to delay their payments, the amounts of equipment sales and services and related payment terms are clearly specified and fixed in the contracts. Our customers have obligations to pay the contract sums in accordance with the contracts.*

(2)     The contracts we have signed with our customers are protected by the laws of the People's Republic of China. We have the right to require the debtors to fulfill their obligations. The company's rights are clearly defined in the People's Republic of China's "General Principles of Civil Law" and in the contract law of the People's Republic of China, which we have included below.

\*\*\*

Contracts drafted in accordance with the law are protected by PRC law.

(3)     The difference between our customers' actual timing of payments and the contract terms does not imply that the contract is not substantive.

As detailed in our responses to comments 3 and 4 to SEC comment letter dated November 21, 2012, our revenues are properly recognized as (i) pervasive evidence

of the arrangements (the contract) exists, (ii) delivery has occurred or services have been rendered, (iii) the price is fixed or determinable in the contracts; and (iv) collectability is probable. As a result, we believe the company's current revenue recognition methods are more suitable than the Cost Recovery Method.

*4.      Tell us whether your formal post collection date invoices reflect the full and complete payment of the original formal contractual sales price. Describe for us the extent to which your Big-3 carrier customers benefit in actual practice from discounts, credits, accommodations and adjustments made to the original sales revenues specified in the original sales contracts.*

**Response:**

Our customers' payment amounts strictly follow the contractual amounts. Our Big-Three carrier customers do not receive discounts, credits, accommodations or adjustments made to the original sales figures specified in the original sales contracts.

Allowance for doubtful accounts, page F-10

*5.      Please clarify the tabular information you have provided in response to comment 5 of our letter dated November 21, 2012. We note that the aging schedule of your accounts receivables present on page 5 of your letter dated December 14, 2012 reflect current year receivables that are materially in excess of total revenues less collected amounts for the years ended December 31, 2010 and 2011.*

**Response:**

The aging schedule of our accounts receivable presented on page 5 of our letter dated December 14, 2012 did not separate the balances that were within payment periods. The table below sets out a revised aging schedule of accounts receivable showing separately the amounts within payment periods and those past due amounts.

| (USD '000) | **2009** | **2010** | **2011** |
|---|---|---|---|
| **With payment periods** | 28,883 | 64,135 | 42,101 |
| **Past due:** | | | |
| Within 1 year | 39,690 | 87,031 | 159,080 |
| Over 1 year | 26,605 | 30,803 | 45,182 |
| Over 2 years | - | 18,381 | 21,415 |
| **Total** | 95,179 | 200,350 | 267,779 |

(Emphasis added.)

53.     On March 22, 2013, the Company submitted a response to the SEC, signed by Defendant Han, which attached three appendices entitled; "Appendix A:  Statement of the Audit Committee of the Board of Directors of the Company Regarding Accounting Methodology for Report on Form 10-K"; "Appendix B:  Minutes of Meeting of the Audit Committee of the Board of Directors of the Company, dated March 5, 2013";  and "Appendix C:  Minutes of Meeting of the Management of the Company, dated March 1, 2013."

54.     "Appendix A:  Statement of the Audit Committee of the Board of Directors of the Company Regarding Accounting Methodology for Report on Form 10-K" was a response to the SEC from the Audit Committee of Telestone's Board of Directors, which included Defendants He, Cheng, and Lu.  According to the Telestone's Audit Committee, Telestone's revenue recognition practices were consistent with GAAP.  Therein, Appendix A, in relevant part, stated:

### Telestone Technologies Corporation
### Audit Committee of the Board of Directors
### Statement Regarding Accounting Methodology for Report on Form 10-K

The undersigned, being all the members of the Audit Committee of the Board of Directors (the "Audit Committee", "we", "our", or "us") of Telestone Technologies Corporation (the "Company", "Telestone", or "it"), in response to comments received from the United States Securities and Exchange Commission (the "SEC"), hereby state our opinion that the accounting methodology the Company uses in its report on Form 10-K is correct, for the following reasons:

Telestone's revenue recognition principles are consistent with U.S. Generally Accepted Accounting Principles ("U.S. GAAP") for the following reasons:

1.      There is convincing evidence, which includes signed sales contracts, that shows an existing customer relationship between Telestone and its customers;

2.      Products have been delivered and/or the services have been rendered to Telestone's customers, and Telestone has confirmations of the acceptance of such products and/or services;

3.      Selling prices provided by the Company to its customers are fixed or can be determined, as the prices stipulated in Telestone's sales contracts are fixed; and

4.      Collectibility of payments is reasonably assured.

With respect to the fourth point above, we would like to provide three supporting grounds, as listed below:

1.      After repeated communications with Telestone's management, the Audit Committee has confirmed that the collectability of the Company's accounts receivable is certain;

2.      Accounts receivable have successfully been collected throughout Telestone's history;

3.      Accounts receivable can successfully be collected from Telestone's primary customers, who are the three largest state-owned telecom carriers in China and whose creditworthiness is extremely high.

Thus, the Audit Committee has found no basis under U.S. GAAP for recommending that the Company alter its accounting methodology. Furthermore, the Audit Committee has not found any other reason to change the Company's accounting methodology for preparing its financials, as such accounting methodologies have been employed for more than 10 years.

We also note that a change in Telestone's accounting methodology in the Company's Form 10-K would be disruptive and endanger the Company's operations (for instance, by changing its credit rating). In addition, such an accounting change would have substantial consequences for the Company's suppliers, customers, investors, and many other stakeholders. We have considered the SEC's inquiry quite seriously in terms of U.S. GAAP, from the point of view of the Company and its investors, and in terms of the resulting consequences of modifications to the Company's accounting methodologies, and we believe there is not sufficient cause for the Company to change the methodology it uses in preparing its financials.

Sincerely,

Yanping He, Telestone, Audit Committee Chairman
Mr. Guanghui Cheng, Audit Committee Member
Mr. Guangjun Lu, Audit Committee Member

55.      "Appendix B:  Minutes of Meeting of the Audit Committee of the Board of Directors of the Company, dated March 5, 2013" contained purported meeting minutes for a March 5, 2013 conference call meeting of Telestone's Audit Committee.  According to the meeting minutes,

Telestone's Audit Committee believed Telestone's revenue recognition practices were consistent with GAAP.  Therein, Appendix B, in relevant part, stated:

> Meeting Content:
>
> A telephonic meeting of the Audit Committee was held on March 5, 2013. Mr. Yuanping He called the meeting to order at 2p.m., Beijing time, and Ms. Jun Man recorded the minutes. All members of the Audit Committee were present, and the meeting, having been duly convened, was ready to proceed with business.
>
> In reference to the conference call between the Company and the U.S. Securities and Exchange Commission (the "SEC") on February 27, 2013, the Audit Committee discussed that Mr. Daqing Han had asked for the Audit Committee's formal opinion concerning Telestone's accounting methods, particularly with respect to revenue recognition and asset classification.
>
> Each of the three independent directors expressed his or her own opinion, and the Committee fully considered whether Telestone's current accounting methods are appropriate.
>
> After thorough discussion, the Audit Committee determined that its opinion is as follows:
>
> The Audit Committee believes that, according to relevant sections of U.S. Generally Accepted Accounting Principles ("U.S. GAAP"), it cannot find sufficient evidence that Telestone's current accounting methods should be changed. With respect to revenue recognition, the Committee specifically noted that, according to U.S. GAAP, revenue should be recognized when it meets four standards:
>
> 1.    There is convincing evidence showing that a buyer-seller relationship exists;
> 2.    Products have been delivered and/or services have been provided;
> 3.    Product prices provided by the seller to the buyer are fixed or can be determined; and
> 4.    Collectibility of payments is reasonably assured.
>
> The Audit Committee believes that because Telestone has signed fixed-price sales contracts with the Company's customers and has received confirmations of the delivery of goods and acceptance reports from the Company's customers, the first three standards are clearly met.
>
> As for the fourth standard, the Audit Committee believes this it is also clearly met as collectibility of payments is certain, based upon a number of factors. Included in these factors are the fact that that Telestone's customers are China's "Big-Three" carriers, who have excellent creditworthiness, which makes it reasonably certain that Telestone will collect its accounts receivable. Moreover, Telestone has been doing

business with these customers for approximately 15 years, and only in recent years have the accounts receivable been delayed. The Committee believes this is a temporary issue that can be mitigated or solved as the customers' capital situation improves and that no steps are necessary in terms of the Company's accounting methods.

The Audit Committee is also aware of the discussions between management of the Company and the independent auditor of the Company that took place on March 1, 2013. *As the Audit Committee is aware that the independent auditor is in agreement with the Company's position and the position of the Audit Committee, the Audit Committee does not feel it is necessary to conduct a separate discussion regarding the issue at this time.*

The Audit Committee determined that it will deliver its opinions to the Company and to the other members of the Board.

(Emphasis added.)

56.     "Appendix C:  Minutes of Meeting of the Management of the Company, dated March 1, 2013" contained purported meeting minutes for a March 1, 2013 conference call meeting in which Defendants Han and Yu, and two representatives of Mazars, Yicheng Ye and Jinwei Su, were present.  According to the meeting minutes, Telestone's Mazars believes that Telestone's revenue recognition practices were consistent with GAAP and that the Company should continue to be able to recognize revenue on an "accrual basis" and not on a "cash basis," as requested by the SEC. Therein, Appendix C, in relevant part, stated:

**Telestone Technologies Corporation**
**Management Meeting Minutes**

| | |
|---|---|
| Meeting Time: | 11 a.m., March 1, 2013 (Beijing time) |
| Meeting Place: | Headquarters of Telestone Technologies Corporation ("Telestone" or the "Company") and via phone |
| Meeting Subject: | Conference call with the U.S. Securities and Exchange Commission (the "SEC") concerning accounting treatments |
| Meeting Director: | Daqing Han, Chairman and CEO of the Company |

Participants:

Telestone
Title

Name

| Chairman of the Board and CEO | Mr. Daqing Han |
| Independent Auditor, Mazars | Mr. Yicheng Ye |
| Independent Auditor, Mazars | Mr. Jinwei Su |
| Vice President and Chief Financial Officer | Ms. Xiaoli Yu |
| Board Secretary | Ms. Jun Man |

Meeting Content:

A telephonic meeting between the Company's management and the Company's independent auditor Mazars was held on March 1, 2013. Mr. Daqing Han called the meeting to order at 11 a.m., Beijing time, and Ms. Jun Man recorded the minutes.

Based on the conference call with the SEC on February 27, 2013, Mr. Daqing Han asked for Mazars' opinion whether Telestone's current accounting treatments, especially for revenue recognition and asset classification, are appropriate.

***Mazars believes that the Company has explained how its accounting treatments are based on and abide by the U.S. Generally Accepted Accounting Principles ("U.S. GAAP") in its written responses to SEC. If the SEC still believes Telestone should switch its accounting treatment, Mazars would hope that the SEC would offer a new principle to support such a position so that the management of Telestone and Mazars could evaluate such an argument.***

***Mazars believes according to relevant provisions of the U.S. GAAP, Telestone's current accounting treatment of recognizing revenue on "accrual basis" instead of "cash basis" is appropriate.***

With respect to the issue of asset classification, Mazars' believes: assets are classified as current if they fall within the "normal operating cycle", which is a process that ends with cash realization. Every company has its own normal operating cycle in terms of goods and services provided. Since in general every company in the telecom industry who serves China's "Big Three" tends to have a relatively long account receivables turnover period, it is not appropriate to classify current and non-current assets on a "one year" basis. Therefore, Telestone's current accounting treatment regarding the classification of accounts receivable is considered appropriate.

(Emphasis added.)

57.     On April 29, 2013, the SEC provided Telestone with a comment letter requesting additional information from the Company.  On June 17, 2013, Telestone submitted a response letter to the SEC, which was signed by Defendant Han.   Therein, Telestone provided the following response, in relevant part, to the April 29, 2013 SEC comment letter:[13]

> Form 10-K
> Financial Statements
> Note 2. Revenue recognition, page F-8
>
> *1.     We note your prior correspondence indicating you believe collectability is reasonably assured and the fee is fixed or determinable for your contracts with each of your "Big Three" customers. Please explain in greater detail why you believe this to be the case for each customer at the time of sale. In your response, explain how you have applied the guidance in SEC Staff Accounting Bulletin Topic 13 (ASC 605-10-S99) with respect to collectability and fixed or determinable fees.*
>
> **Response:**
>
> With respect to the fee being fixed or determinable at the time of sale:
>
> The sale prices for both equipment and services are stipulated in each of our contracts with our customers. Our customers do not receive any kind of discount on the contract price.
>
> After the final sales contract, which is signed shortly after services or products have been accepted by the customer, has been signed, the amount set forth in such contract becomes due and there can be neither future post-payment refunds for equipment or services nor any other adjustments to pricing or other contract terms. This documentation also acts as an acknowledgment on behalf of the customer that the goods have been delivered or the services have been performed and the customer is now responsible for paying the amounts set forth in such documents.
>
> ASC 605-10-S99 stipulates: The seller's price to the buyer is fixed or determinable. The FASB ASC Master Glossary defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment." Given that our fees are set forth in the contracts and are not subject to adjustment or refund as set forth above, we have determined them to be fixed and determinable.
>
> With respect to collectability being reasonably assured at the time of sale:

---

[13] The comments from the SEC comment letter, dated April 29, 2013, which were reproduced in Telestone's June 17, 2013 response, are italized.

As noted above, once the contract has been signed, there can be no refunds for equipment or services, or other adjustments. ASC 605-10-S99 points to ASC 985-605-25-3 which in turn calls out ASC 985-605-25-13 through 25-14 concerning collectibility (though primarily applicable to software sales). With respect to those sections as noted, the Company's contracts do not provide for such refunds or adjustments nor does the Company have a history of making such concessions and as such the Company sees no impact on collectibility from that standpoint. Similarly, given that the Big 3 have historically paid their contracts in full, the Company finds no reason to believe that collectibility of fees would be doubtful as set forth in FASB Statement of Concepts No. 5 paragraph 84(g). Moreover, the Company has not observed nor do we expect to observe any bankruptcies amongst these customers in the foreseeable future. Therefore, we believe that the collectibility of fees from such customers is reasonably assured.

2.      *We note your prior correspondence indicating you believe persuasive evidence of an arrangement exists based on the signed contract between the parties. You have also concluded that the seller's price to the buyer is fixed or determinable. Please explain in greater detail why you believe both of these criteria for revenue recognition can be met based on the fact that your "Big Three" customers do not pay pursuant to contractual terms.*

**Response:**

With respect to there being persuasive evidence of an arrangement despite payment delays:

Generally, according to Staff Accounting Bulletin Topic 13 ("SAB 13"), if a company's usual course of business is to use written contracts with its customers, the Staff will view such as persuasive evidence of an arrangement. There are exceptions to this. However, regardless of the exceptions to the general premise, it would seem that a party's unilateral non-compliance with an already formed arrangement should not be construed as evidence on no arrangement having existed. If we took the position that non-compliance amounted to evidence of no arrangement existing, that would seem to undermine the ability to form contractual relationships at a fundamental level and it would leave the performing party without any recourse (as there would be no contract to legally enforce).

Upon entry into a contractual arrangement there is always the possibility that one party may not conform to the terms of the agreement. However, this does not entail that a contractual arrangement did not exist and it does not entail that there was not persuasive evidence of an arrangement. If we are to believe that future non-compliance means that there was no arrangement at the time of contracting, it is unclear how two parties can enter into a contractual relationship.

While the Company has made a current business decision not to pursue all of the legal avenues available to the Company with respect to the collection of delayed

payments, that does not mean that those avenues do not exist, nor does it mean those avenues will cease to exist, and it does not mean that persuasive evidence of an arrangement between the parties does not continue to exist. As further discussed in the response to comment #6 below, should there be a change to the calculus that management has utilized to make its decision to not involve the court system, the Company may well seek to enforce its rights under the contracts that it has entered into. For now though, the Company remains confident that even if a customer does not strictly comply with a payment terms in a contract, the contract is still enforceable and persuasive evidence of an arrangement has existed and will continue to exist until the Company receives payment in full or determines that it will seek legal remedies.

With respect to the price to the buyer being fixed and determinable despite payment delays:

The Company maintains that the amounts are set forth in its written agreements, and are further confirmed upon the formal acceptance of the Company's services or products. Such prices are not subject to adjustment, refund, or discount and the Company fully expects to receive the entire amounts under its contracts with the Big 3. Further, documents signed by the customer upon or shortly after acceptance act as acknowledgement that the customer is now responsible for paying the amounts set forth in such documents. As noted above, the non-compliance with a contractual term of an agreement is not evidence of no arrangement existing, and, just as the Company believes that the right to payment exists and the right to enforce payment exists, it also believes that the amounts are fixed and determinable.

3.      *We note a significant increase in your Accounts Receivable turnover and Days Sales Outstanding during 2011 and 2012, which seems to be indicative of deterioration in your customer's credit or ability/willingness to pay. In light of this, please explain your basis for continuing to conclude that collectability is reasonably assured. Tell us, even if you were able to conclude collectability was reasonably assured at the time of sale for a particular customer, how you were still able to conclude in subsequent periods that collectability was reasonably assured after the customer did not pay pursuant to contractual terms.*

**Response:**

During 2011 and 2012, our outstanding accounts receivable increased significantly. This was mainly due to a period of intensive 3G wireless network construction by our customers. Net accounts receivable in 2011 increased by $58,973,000, or 30%, when compared with those at the end of 2010. As of March 31, 2012, net accounts receivable increased by 26.7% versus December 31, 2010….

***

*5.	We note your prior correspondence indicating the Company believes it will collect all amounts due from its "Big Three" customers. Tell us whether the Company has any history of not collecting the entire amount due in accordance with the customer's contract. Tell us whether the Company has ever given a concession in any form to a customer. If so, please describe the nature of those concessions.*

**Response:**

Our Customers have never received any form of concession in terms of the payment amount. Technically, thus far, our Company has never had to write off any bad debts. This is due to the fact that all contracts either have already been paid or are currently in the process of payment.

*6.	We note from your prior correspondence that the Company believes it has a legal right to demand payment from customers under the jurisdiction in the PRC. Describe for us the extent to which the Company has ever taken legal action against a customer for lack of payment pursuant to contractual terms. Tell us whether and, if so, when the Company intends to take legal action against any customers that fail to pay pursuant to contractual terms.*

**Response:**

If a company is faced with a customer that does not comply with contractual terms, the management of the company must make a business decision and weigh the relative positive and negative aspects of pursuing legal action. In this case, given that (i) the management of the Company views collectibility of the accounts receivable as being reasonably assured (even if the Company does not involve the courts), (ii) pursuing a legal action against its biggest customers could adversely impact the Company's business, (iii) the Company has always received the amounts due, even if delayed, and (iv) the delay in payments has not adversely impacted the conduct of the business of the Company, the Company to date has determined not to seek a legal remedy for payment delays. However, should the preceding calculus change, the ability to seek a legal remedy remains open to the Company. Further, while in certain U.S. jurisdictions acceptance of payments not in accordance with contract terms may foreclose suit concerning collection (e.g., under a UCC "course of performance" or some other legal theory), the PRC has no such law or precedent that would prevent the Company from bringing a lawsuit or cast doubt on the ability of the Company to prevail on the merits of such a lawsuit.

58.	On June 26, 2013, the SEC provided Telestone with a comment letter requesting additional information from the Company.  On July 17, 2013, Telestone submitted a response letter

to the SEC, which was signed by Defendant Han.   Therein, Telestone provided the following response, in relevant part, to the June 26, 2013 SEC comment letter:[14]

Financial Statements

Note 2. Revenue recognition, page F-8

*1.      We have considered your response to prior comment 1 in your letter dated June 17, 2013. We note that you have recorded amounts for estimated uncollectable accounts receivable. Please tell us how you determined that a portion of your accounts receivable were estimated to not be collected. Reconcile your conclusion that a portion of your accounts receivable will not be collectable and your statement that "the Big 3 historically paid their contracts in full." In this regard, tell us how much of your allowance for doubtful accounts has been provided for each of your Big 3 customers and for your other customers.*

**Response:**

As the Company has stated in its previous correspondence, although our customers may pay late, the Big-3 carriers have historically paid all of their bills in full. That said, the Company will record uncollectable accounts receivable if certain criteria are met (even if the Company expects that payment will occur at some point in the future). The Company calculates its bad-debt provisions taking into consideration the aging of accounts receivable, the closeness of our customer relationships, the amounts of payments made in the past year, and our forecast of our customers' future payments. First, we take a bad-debt provision when receivables are more than two years old and no new transactions or collections have occurred. Second, we take a bad debt provision when a receivable is more than two years old and there has been little collection in the past year, or our forecast predicts poor collection of the receivable.

According to our 2012 Q3 financial statements, our bad debt provision was $32.4 million. Of this figure, $18 million was for China Mobile, $7.2 million was for China Unicom, $5.1 million was for China Telecom, and the remaining $2.1 million was for other customers.

Our bad-debt provision is broken down in the table below:

---

[14] The comments from the SEC comment letter, dated June 26, 2013, which were reproduced in Telestone's July 17, 2013 response, are italized.

| RMB '000 | Telestone Technologies | Telestone Wireless | Telestone Communication Technology | Guolian | Fantai | Total | USD '000 |
|---|---|---|---|---|---|---|---|
| China Mobile | 97,958.39 | 10,533.64 | - | - | 3,540.54 | 112,032.58 | 17,997.05 |
| China Unicom | 44,374.41 | 389.98 | - | - | - | 44,764.39 | 7,191.00 |
| China Telecom | 31,118.31 | 794.83 | - | - | - | 31,913.14 | 5,126.56 |
| Others | 11,207.61 | 92.79 | 315.67 | 1,498.16 | - | 13,114.24 | 2,106.69 |

59.     On November 26, 2013, the SEC issued a letter to Defendant Han that, in relevant

part, stated:

> On September 4, 2013, the staff informed Telestone Technologies, Inc.'s management that it was unable to continue the registrant's appeal process because it had not received the information specified in our June 26, 2013 comment letter. The staff explained that, unless and until such information is provided, the appeal could not proceed. ***As a result, the staff reiterated its position that the registrant should amend its historical financial statements contained in its 2011 Form 10-K and subsequent Form 10-Qs to recognize revenues on a cash basis. The staff also reiterated that the registrant should file an Item 4.02 Form 8-K regarding non-reliance on previously-issued financial statements.*** As of the date of this letter, we have not received the information requested, nor have you filed amended historical financial statements. Consequently, we expect you either to provide a complete substantive response to the outstanding comments or to file those amended Exchange Act reports by December 11, 2013.
>
> If you do not respond, we will, consistent with our obligations under the federal securities laws, decide how we will seek to resolve material outstanding comments and complete our review of your filing and your disclosure. Among other things, we may decide to release publicly, through the agency's EDGAR system, all correspondence, including this letter, relating to the review of your filing, consistent with the staff's decision to release publicly comment letters and response letters relating to disclosure filings it has reviewed.

(Emphasis added.)

60.     On February 19, 2014, the SEC issued a letter to Defendant Han that, in relevant part,

stated:

We issued comments on the above captioned filing on June 26, 2013. On November 26, 2013, we issued a follow-up letter informing you that those comments remained outstanding and unresolved, and absent a substantive response, we would act consistent with our obligations under the federal securities laws. We considered your response letter dated December 11, 2013 and determined that you did not provide a substantive response to our comment letter dated June 26, 2013. As you have not provided a substantive response, we are terminating our review and will take further steps as we deem appropriate. These steps will include our releasing all correspondence relating to our review on the EDGAR system.

## V.   DEFENDANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED GAAP BY IMPROPERLY RECOGNIZING REVENUE

### A.   Obligations Imposed by the Securities Laws and U.S. GAAP

61.   The Financial Accounting Standards Board ("FASB") is the designated private sector organization for establishing standards of financial accounting that govern the preparation of financial.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.  In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. ASC 105-10-05-1.

62.   Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

### B.   The Company Systematically Violated Its Own Revenue Recognition Policy as Well as GAAP Revenue Recognition Principles

63.   Throughout the Class Period, the Company's revenue recognition policy remained substantially consistent.  For example, Telestone's 2009 Form 10-K, 2010 Form 10-K, and 2011 Form 10-K, in relevant part, all state:

> Net sales of equipment represent the invoiced value of goods, net of value-added tax ("VAT") and returns.  The Company generally recognizes product revenue when persuasive evidence of an arrangement exists, delivery occurs, the fee is fixed or determinable, and collectibility is probable.  Service revenue is recognized when the service is performed and accepted by the customer. The Company has a policy of including handling costs incurred for finished goods, which are not significant, in the sales and marketing expenses.

> The Company provides installation services for certain sales of equipment under fixed-price contracts.  Revenues from these fixed-price service contracts are recognized on the completed-contract method. Under the completed-contract method, revenue and costs of individual contracts are included in operations in the year during which they are completed.  Losses expected to be incurred on contracts in progress are recognized in the period such losses are determined.  This method is used because the contract is completed within a short period of time, and the financial position and results of operations do not vary significantly from those that would result from using the percentage-of-completion method.  A contract is considered completed upon completion of all essential contract work and the installation has been accepted by the customer.

64.   The Company's revenue recognition policy tracks Staff Accounting Bulletin No. 101 ("SAB 101"), as amended by Staff Accounting Bulletin No. 104 ("SAB 104").  SAB 104, Topic 13, *Revenue Recognition*, as amended, and SAB 101, *Revenue Recognition in Financial Statements*, clearly state that revenue is realized or realizable and earned only if and when all of the following criteria are met:

> (a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;

> (b) "Delivery has occurred or services have been rendered;"

> (c) "The seller's price to the buyer is fixed or determinable;" and

> (d) "Collectibility is reasonably assured."

SAB 101(A)(1).

65.    Additionally, FASB Statement of Concepts[15] ("CON") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises articulates that revenues and gains should not be recognized in financial statements until they are both earned and realizable:

(a) "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [FASB Statement of Concepts No. 5, 83a]."

(b) "Revenues are not recognized until earned. An entity's revenue-activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [FASB Statement of Concepts No.5, 83b]."

(c) "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [FASB Statement of Concepts No. 5, 84a]."

Moreover, if collectability is not reasonably assured, revenues should be recognized on the basis of cash received. FASB Statement of Concepts No. 5, 84g.

66.    Defendants, however, failed to apply these basic accounting principles – improperly recognizing revenue on its purported sales to the Big 3 in violation of GAAP, and its stated revenue recognition policy, even though payment was not reasonably assured and the price was not fixed or determinable.  Therefore, the Company's statements regarding its revenue and sales related to these transactions were false and materially misleading during the Class Period.

---

[15] FASB Statements of Financial Accounting Concepts broadly cover financial reporting concepts. FASB publishes these documents to provide a general overview of accounting concepts, definitions, and ideas guiding recognition and measurement for financial reporting purposes.

**C.    The Company's Knowingly and/or Recklessly Improper Recognition of Revenue Related for "Sales" to the Big 3 Where the Sales Contracts Were Not Substantive, the Sales Price Was Not Fixed or Determinable, and Collectability Was Not Reasonably Assured**

67.     Telestone reported significant revenues (as further described below) for each fiscal quarter and year during the Class Period from sales to the Big 3 in China.

68.     In order to recognize the revenue from these transactions, SABs 101 and 104 and the SEC Codification of Staff Accounting Bulletin, Topic 13 criterion require that "persuasive evidence of an arrangement exists," "the seller's price to the buyer is fixed or determinable," and "collectability is reasonably assured." However, Defendants communications with the SEC subsequently admitted that none of these requirements were satisfied at the time that the revenue at issue was recognized.

**1.    Telestone Improperly Recognized Revenue Even Though There Was Not Persuasive Evidence of a Substantive Arrangement**

69.     For revenue to be recognized on a transaction, there must be persuasive evidence of an existing arrangement.  SAB 104, Topic 13.  The "term 'arrangement' in this SAB Topic is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction."  SAB 104, Topic 13.A.1, n.3.  Here, there was not a final understanding between the parties regarding the nature and terms of the transaction since Defendants were aware that Telestone's customers repeatedly ignored the terms of the purported contracts.

70.     Defendants admit that the Big 3 routinely ignored the terms of their purported contracts.  For example, in addressing the SEC's position that the Company's contracts are not substantive, Telestone's February 8, 2013 letter to the SEC, in relevant part, concedes that:

(1)     Although our customers generally tend to delay their payments, the amounts of equipment sales and services and related payment terms are clearly specified and fixed in the contracts…

71.     Additionally, Telestone further concedes that its Big 3 customers have their own payment processes that are different from the terms of the contract, demonstrating that there was not an agreement regarding the contract.  For example, in Telestone's September 24, 2012 letter to the SEC, the Company, in relevant part, admitted that:

> Our disclosure stating that once a contract is signed, we receive 60-70% of our receivables within 4 to 9 months and another 20-30% in 9 to 12 months, is based upon the terms as stipulated in our contracts. ***However, the carriers have their own payment process which is always not in accordance with the terms as stipulated in contracts. That is why our DSO has continued to increase. Because of the absolute monopoly position of big three carriers in China's communications industry, we are unable to exercise significant influence to ask the big three carriers to follow the terms as stipulated in our contracts.***

(Emphasis added.)

72.     Since Telestone's customers systematically ignored the purported terms of the contract, there was not persuasive evidence of an exchange arrangement.  In fact, in part due to the Big 3's continued failure to abide by the purported terms of the contracts, the SEC informed Defendants that Telestone should have recognized revenue solely on a cost recovery basis (*i.e.* only recognize revenue upon payment) in their 2011 Form 10-K and subsequent Form 10-Qs.

### 2.     Telestone Improperly Recognized Revenue Even Though the Sales Price Was Not Fixed or Determinable

73.     As outlined above, SAB 104 requires a transaction to have a "fixed or determinable sales price" in order to recognize revenue.  A factor that impacts the determination of whether an arrangement is fixed or determinable is whether the customer has been granted extended payment terms.  Here, Defendants concede that they granted the Big 3 a concession to not pay Telestone in accordance with the contract.

74.     According to the Company, "once a contract is signed, we receive 60-70% of our receivables within 4 to 9 months and another 20-30% in 9 to 12 months, … based upon the terms as stipulated in our contracts."  This is not what occurred here.  As the Company admitted, after 2009

Telestone only collected approximately 14% to 16% of its billed and outstanding gross trade receivables each year.

75.    Additionally, the staggering increase in the Company's DSO (Days Sales Outstanding) during the Class Period, without bringing any legal action for payment, demonstrates that Telestone was granting its customers a payment concession:

*The table below contains an analysis of the movements in our accounts receivable:*

|  | *2009* | *2010* | *2011* | *2012Q1* | *2012Q2* |
|---|---|---|---|---|---|
| Opening receivables, gross | 67,912 | 95,179 | 200,350 | 267,779 | 272,826 |
| Opening receivables, net | 62,136 | 89,005 | 192,487 | 251,460 | 256,477 |
| Service revenue | 41,717 | 66,492 | 69,783 | 13,572 | 11,913 |
| Equipment revenue (VAT included) | 35,290 | 76,237 | 45,959 | 4,131 | 6,965 |
| Receivables collected | 49,740 | 37,558 | 48,313 | 12,656 | 13,863 |
| Ending receivables, gross | 95,179 | 200,350 | 267,779 | 272,826 | 277,841 |
| Ending receivables, gross | 89,005 | 192,487 | 251,460 | 256,477 | 259,562 |
| Increase in receivables | 27,267 | 105,171 | 67,429 | 5,047 | 5,015 |
| Increase versus last period | 40% | 110% | 34% | 2% | 2% |
| *DSOs* | *358* | *355* | *690* | *1,291* | *1,232* |

(Emphasis added.)   Allowing the Company's customers more than three years to pay for goods and services that had already been provided demonstrates that Telestone was granting clients a payment concessions. As the Company explained:

> Our disclosure stating that once a contract is signed, we receive 60-70% of our receivables within 4 to 9 months and another 20-30% in 9 to 12 months, is based upon the terms as stipulated in our contracts. However, *the carriers have their own payment process which is always not in accordance with the terms as stipulated in contracts. That is why our DSO has continued to increase.*

(Emphasis added.)

76.    Since Defendants were granting payment concessions and the sales terms as laid out in the contract were not followed, the sales price for these contracts was not fixed and determinable.

77.     Therefore, Defendants revenue recognition on these transactions was improper and in violation of both GAAP and the Company's stated revenue recognition policy.

### 3.     Telestone Improperly Recognized Revenue When Collectability Was Not Reasonably Assured

78.     GAAP and the Company's revenue recognition policy require that collectability is probable in order to recognize revenue.  However, in communications with the SEC, Defendants admitted that collectability of its revenues was not reasonably assured in regards to sales to the Big 3, and also that the Big 3 constituted a significant majority of its total sales, and that Defendants lacked a rational basis for claiming that its revenue was likely to be collected.

79.     During the Class Period, there was a significant increase in Telestone's accounts receivable and Days Sales Outstanding during 2011 and 2012, which is indicative of deterioration in the Company's ability/willingness to pay.  For example, the Company's DSOs almost doubled in 2011, and then almost doubled again in the first two quarters of 2012:

|        | *2009* | *2010* | *2011* | *2012Q1* | *2012Q2* |
|--------|--------|--------|--------|----------|----------|
| DSOs   | 358    | 355    | 690    | 1,291    | 1,232    |

80.     Likewise, Telestone's accounts receivable drastically increased during this time period:

|                          | *2009* | *2010* | *2011*  | *2012Q1* | *2012Q2* |
|--------------------------|--------|--------|---------|----------|----------|
| Opening receivables, gross | 67,912 | 95,179 | 200,350 | 267,779  | 272,826  |
| Opening receivables, net   | 62,136 | 89,005 | 192,487 | 251,460  | 256,477  |

81.     Telestone further admitted in a letter to the SEC on November 9, 2012, that as of the end of the Company's 2012 fiscal second quarter, Telestone had collected only a small portion of its WFDS revenues, even going back years:

|  | 2009 | 2010 | 2011 | 2012 Q1 and Q2 |
|---|---|---|---|---|
| Sales of WFDS | 1,438 | 36,665 | 29,610 | 7,374 |
| Percent of Revenues | 2.0% | 27.8% | 27.1% | 21.1% |
| WFDS Receivables Collected | 388 | 8,986 | 12,199 | 3,348 |
| Proportion of total receivable collected | 0.8% | 22.9% | 21.5% | 26.4% |

*In thousand USD

82.     These facts belie Defendants' representations that due to the creditworthiness of its customers, Telestone believed that there is no significant risk on collectability of accounts receivables as long as the services and the goods are accepted by the customers.

83.     Moreover, as discussed above, Telestone's Big 3 customers often ignored the terms of their contracts with the Company. As Telestone admitted in its February 8, 2013 response to the SEC, in relevant part, that:

(1)     As stated in our reply to the first comment letter dated November 21, 2012, the telecom carriers' constant adjustment of their network construction investment plans and *their decision-making processes brings uncertainty to their payment cycles and therefore, causes uncertainty in our cash flows. In other words, the funds that the carriers plan to invest in our joint projects may be diverted to other business projects due to changes in their investment decisions. These decisions prevent our trade receivables from being collected on a timely basis and also add uncertainty to the collection period.*

(2)     Since China's three major carriers account for a majority of the Company's total revenue and trade receivables, the effect of any changes in the carriers' investment plans and funding arrangements can be substantial.

(Emphasis added.)

84.     This demonstrates that collectability was not reasonably assured.  Additionally, Defendants had no ability to force its Big 3 customers to pay for the goods and services provided. As Telestone admitted, "we are unable to exercise significant influence to ask the big three carriers

to follow the terms as stipulated in our contracts" and "the carriers have their own payment process which is always not in accordance with the terms as stipulated in contracts."

85.     Since the collectability of revenue was not reasonably assured, Telestone should have only recognized revenue on the basis of cash received.  FASB Statement of Concepts No. 5, 84g. The SEC is in agreement with the position "that the registrant [Telestone] should amend its historical financial statements contained in its 2011 Form 10-K and subsequent Form 10-Qs to recognize revenues on a cash basis."

86.     Defendants ignored SAB 104 and Telestone's own revenue recognition policy and, in doing so, improperly recognized revenue from its transactions with the Big 3 transactions during the Class Period.

87.     Defendants additionally violated an overarching accounting principle that revenues and gains should not be recognized in the financial statements until they are both earned and realizable. CON No. 5.

### D.     Telestone's Additional GAAP Violations

88.     Telestone also inflated earnings during the Class Period both by failing to write off accounts receivable when it was probable they were uncollectible and by failing to record an adequate allowance for doubtful accounts.  FASB Statement No. 5 advises that a loss shall be recognized if information indicates that it is probable that an asset, such as the Company's accounts receivable, has become impaired.  Despite Defendants' knowledge that it was probable that accounts receivable arising from their improper "sales" to the Big 3, as described above, had become impaired, and that Telestone's allowance for doubtful accounts was inadequate, these losses were not timely recognized in the Company's 2009 Form 10-K, Q1 2010 Form 10-Q, Q2 2010 Form 10-Q,

Q3 2010 Form 10-Q, 2010 Form 10-K, Q1 2011 Form 10-Q, Q2 2011 Form 10-Q, Q3 2011 Form 10-Q, 2011 Form 10-K, Q1 2012 Form 10-Q, Q2 2012 Form 10-Q, and Q3 2012 Form 10-Q.

89.     Telestone's financial statements and its comments about the Company's financial results were false and misleading, as this financial information was not prepared in conformity with GAAP; nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting and disclosures about its revenues, in violation of GAAP rules.

90.     Additionally, as explained above, Defendants issued financial statements that were false and misleading when originally issued since they violated the Company's stated revenue recognition policy and GAAP, including SABs 101 and 104, and FASB Statement of Concepts No. 5.

91.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

a.  The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

b.  The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, 40);

c.  The principle that "financial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, 42);

d.   The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, 50);

e.   The principle that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2, 58-59);

f.   The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (FASB Statement of Concepts No. 2, 79); and

g.   The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" (FASB Statement of Concepts No. 2, 95).

92.   The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## VI.   TELESTONE'S KNOWINGLY AND/OR RECKLESSLY FALSE AND/OR MISLEADING FINANCIAL STATEMENTS DURING THE CLASS PERIOD

93.   During the Class Period, Telestone filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K. The following chart identifies the date, signatories, and period covered by each report:

| TELESTONE'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| FORM | PERIOD | DATE FILED | SIGNATORIES | REFERRED TO BELOW AS |
| 10-K | 2009 Fiscal Year | 3/31/10 | Defendants Han,  H. Li, Zhu, Cheng, and Pan | 2009 Form 10-K |
| 10-Q | 2010 Fiscal 1st Quarter | 5/17/10 | Defendants Han and Yu | Q1 2010 Form 10-Q |
| 10-Q | 2010 Fiscal 2nd Quarter | 8/12/10 | Defendants Han and Yu | Q2 2010 Form 10-Q |
| 10-Q | 2010 Fiscal 3rd Quarter | 11/15/10 | Defendants Han and Yu | Q3 2010 Form 10-Q |
| 10-K | 2010 Fiscal Year | 3/30/11 | Defendants Han,  Yu, M. Li, Zhu, Cheng, and Pan | 2010 Form 10-K |
| 10-Q | 2011 Fiscal 1st Quarter | 5/16/11 | Defendants Han and Yu | Q1 2011 Form 10-Q |
| 10-Q | 2011 Fiscal 2nd Quarter | 8/15/11 | Defendants Han and Yu | Q2 2011 Form 10-Q |
| 10-Q | 2011 Fiscal 3rd Quarter | 11/21/11 | Defendants Han and Yu | Q3 2011 Form 10-Q |
| 10-K | 2011 Fiscal Year | 3/30/12 | Defendants Han,  Yu, Lu, He, Cheng, and Pan | 2011 Form 10-K |
| 10-Q | 2012 Fiscal 1st Quarter | 5/21/12 | Defendants Han and Yu | Q1 2012 Form 10-Q |
| 10-Q | 2012 Fiscal 2nd Quarter | 8/14/12 | Defendants Han and Yu | Q2 2012 Form 10-Q |
| 10-Q | 2012 Fiscal 3rd Quarter | 11/19/12 | Defendants Han and Yu | Q3 2012 Form 10-Q |

94.     Additionally, Telestone issued press releases announcing the Company's annual and quarterly financial results.

95.     All of Telestone's financial statements/results issued during the Class Period, as well as financial results that were derived from those financial statements, that were discussed in those SEC filings, and discussed in the Company's press releases, were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP.

A.    **Financial Misstatements in the Company's 2009 Fiscal Year Financial Results**

96.    The Company's 2009 Form 10-K and 2009 Form 8-K, in relevant part, reported the following financial results for Telestone's 2009 fiscal year:

        a.    "Revenue" was $71.9 million;

        b.    "Net Income" was $12.5 million;

        c.    "Gross Profit" was $30.5 million; and

        d.    "Accounts Receivable" was $89,005,000.

97.    Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

B.    **Financial Misstatements in the Company's 2010 Fiscal First Quarter Financial Results**

98.    The Company's Q1 2010 Form 10-Q and Q1 2010 Form 8-K, in relevant part, reported the following financial results for Telestone's 2010 fiscal first quarter:

        a.    "Revenue" was $11.1 million;

        b.    "Net Income" was a loss of $1.1 million;

        c.    "Gross Profit" was $4.9 million; and

        d.    "Accounts Receivable" was $90.4 million

99.     Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**C.      Financial Misstatements in the Company's 2010 Fiscal Second Quarter Financial Results**

100.    The Company's Q2 2010 Form 10-Q and Q2 2010 Form 8-K, in relevant part, reported the following financial results for Telestone's 2010 fiscal second quarter:

   a.      "Revenue" was $16.6 million;

   b.      "Net Income" was $1.7 million;

   c.      "Gross Profit" was $7.5 million; and

   d.      "Accounts Receivable" was $100.9 million.

101.    Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**D.** **Financial Misstatements in the Company's 2010 Fiscal Third Quarter Financial Results**

102.    The Company's Q3 2010 Form 10-Q and Q3 2010 Form 8-K, in relevant part, reported the following financial results for Telestone's 2010 fiscal third quarter:

      a.    "Revenue" was $43.1 million;

      b.    "Net Income" was $12.1 million;

      c.    "Gross Profit" was $19.5 million; and

      d.    "Accounts Receivable" was $134.0 million.

103.    Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**E.** **Financial Misstatements in the Company's 2010 Fiscal Year and Fiscal Fourth Quarter Financial Results**

104.    The Company's 2010 Form 10-K and 2010 Form 8-K, in relevant part, reported the following financial results for Telestone's 2010 fiscal year:

      a.    "Revenue" was $131.7 million;

      b.    "Net Income" was $25.0 million;

      c.    "Gross Profit" was $58.9 million; and

      d.    "Accounts Receivable" was $192.4 million.

105.    The Company's 2010 Form 10-K and 2010 Form 8-K, in relevant part, reported the following financial results for Telestone's 2010 fiscal fourth quarter:

        a.      "Revenue" was $60.8 million;

        b.      "Net Income" was $12.3 million;

        c.      "Gross Profit" was $26.9 million; and

        d.      "Accounts Receivable" was $192.4 million.

106.    Each of the financial results in the preceding two paragraphs was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**F.**    **Financial Misstatements in the Company's 2011 Fiscal First Quarter Financial Results**

107.    The Company's Q1 2011 Form 10-Q and Q1 2011 Form 8-K, in relevant part, reported the following financial results for Telestone's 2011 fiscal first quarter:

        a.      "Revenue" was $14.5 million;

        b.      "Net Income" was $1.6 million;

        c.      "Gross Profit" was $6.6 million; and

        d.      "Accounts Receivable" was $197.9 million.   .

108.    Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had

improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

G.     **Financial Misstatements in the Company's 2011 Fiscal Second Quarter Financial Results**

109.    The Company's Q2 2011 Form 10-Q and Q2 2011 Form 8-K, in relevant part, reported the following financial results for Telestone's 2011 fiscal second quarter:

a.     "Revenue" was $24.3 million;

b.     "Net Income" was $4.5 million;

c.     "Gross Profit" was $10.6 million; and

d.     "Accounts Receivable" was $206.3 million.

110.    Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

### H.   Financial Misstatements in the Company's 2011 Fiscal Third Quarter Financial Results

111.   The Company's Q3 2011 Form 10-Q and Q3 2011 Form 8-K, in relevant part, reported the following financial results for Telestone's 2011 fiscal third quarter:

      a.     "Revenue" was $29.6 million;

      b.     "Net Income"  was $5.2 million;

      c.     "Gross Profit "was $12.9 million; and

      d.     "Accounts Receivable" was $223.3 million.

112.   Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

### I.   Financial Misstatements in the Company's 2011 Fiscal Year and Fiscal Fourth Quarter Financial Results

113.   The Company's 2011 Form 10-K and 2011 Form 8-K, in relevant part, reported the following financial results for Telestone's 2011 fiscal year:

      a.     "Revenue" was $109.1 million;

      b.     "Net Income" was $14.9 million;

      c.     "Gross Profit" was $48.5 million; and

      d.     "Accounts Receivable" was $251.4 million.

114.     The Company's 2011 Form 10-K and 2011 Form 8-K, in relevant part, reported the following financial results for Telestone's 2011 fiscal fourth quarter:

        a.      "Revenue" was $40.6 million;

        b.      "Net Income" was $3.5 million;

        c.      "Gross Profit" was $18.4 million; and

        d.      "Accounts Receivable" was $251.4 million.

115.     Each of the financial results in the preceding two paragraphs was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**J.     Financial Misstatements in the Company's 2012 Fiscal First Quarter Financial Results**

116.     The Company's Q1 2012 Form 10-Q and Q1 2012 Form 8-K, in relevant part, reported the following financial results for Telestone's 2012 fiscal first quarter:

        a.      "Revenue" was $17.1 million;

        b.      "Net Income" was $0.5 million;

        c.      "Gross Profit" was $6.5 million; and

        d.      "Accounts Receivable" was $256.4 million.

117.     Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had

improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**K.  Financial Misstatements in the Company's 2012 Fiscal Second Quarter Financial Results**

118.   The Company's Q2 2012 Form 10-Q and Q2 2012 Form 8-K, in relevant part, reported the following financial results for Telestone's 2012 fiscal second quarter:

a.   "Revenue" was $17.9 million;

b.   "Net Income" was a loss of $1.3 million;

c.   "Gross Profit" was $6.6 million; and

d.   "Accounts Receivable" was $259.5 million.

119.   Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**L.**   **Financial Misstatements in the Company's 2012 Fiscal Third Quarter Financial Results**

120.   The Company's Q3 2012 Form 10-Q and Q3 2012 Form 8-K, in relevant part, reported the following financial results for Telestone's 2012 fiscal third quarter:

       a.   "Revenue" was $17.4 million;

       b.   "Net Income" was a loss of $13.1 million;

       c.   "Gross Profit" was $6.8 million; and

       d.   "Accounts Receivable" was $243.9 million.

121.   Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

**VII.   MATERIALLY FALSE AND MISLEADING SARBANES-OXLEY CERTIFICATIONS**

122.   Each of Telestone's financial statements issued during the Class Period,[16] contained substantially similar Sarbanes-Oxley Required Certification, signed by Defendants Daqing Han, Hong Li, Xiaoli Yu, who certified:

       1.   I have reviewed this Annual Report on Form 10-K of Telestone Technologies Corporation;

---

[16] These include 2009 Form 10-K, Q1 2010 Form 10-Q, Q2 2010 Form 10-Q, Q3 2010 Form 10-Q, 2010 Form 10-K, Q1 2011 Form 10-Q, Q2 2011 Form 10-Q, Q3 2011 Form 10-Q, 2011 Form 10-K, Q1 2012 Form 10-Q, Q2 2012 Form 10-Q, and Q3 2012 Form 10-Q.

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and we have;

   a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

123.   Each of these statements was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to the Big 3 carriers in China; (2) that the Company's revenue, accounts receivable, operating income and net income were overstated; (3) that the Company should have been accounting for its revenue on a cash basis; (4) that the Company had ineffective internal controls that were fraught with material weaknesses; and (5) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

## VIII.   MAZARS' FALSE AND MISLEADING AUDIT REPORTS

124.   During the Class Period, Mazars performed audits on Telestone's 2009, 2010, and 2011 financial statements.  For each of these years, Mazars issued Independent Auditors' Reports ("Auditors' Reports"), in which it opined that Telestone's financial statements conformed to GAAP.

125.   The 2009 Form 10-K contained a letter from Mazars, which stated:

**Report of Independent Registered Public Accounting Firm**

To the Audit Committee, Stockholders and Board of Directors
**Telestone Technologies Corporation**

We have audited the accompanying consolidated balance sheets of Telestone Technologies Corporation and its subsidiaries (the "Company") as of December 31, 2009 and 2008, and the related consolidated statements of operations and other

comprehensive income, changes in stockholders' equity and cash flows for each of the years then ended.  These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.  The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting.  Our audits included consideration of internal control over financial reporting as a basis for designing auditing procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting.  Accordingly, we express no such opinion.  Our audits also included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2009 and 2008, and the results of its operations and its cash flows for each of the years then ended in conformity with accounting principles generally accepted in the United States of America.

**Mazars CPA Limited**
*Certified Public Accountants*
Hong Kong
Date: March 31, 2010

126.    The 2010 Form 10-K contained a letter from Mazars, which stated:

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
**Telestone Technologies Corporation**

We have audited the accompanying consolidated balance sheets of Telestone Technologies Corporation and its subsidiaries (the "Company") as of December 31, 2010 and 2009, and the related consolidated statements of operations and other comprehensive income, changes in stockholders' equity and cash flows for each of the years then ended.  These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing auditing procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. Our audits also included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2010 and 2009, and the results of its operations and its cash flows for each of the years then ended in conformity with accounting principles generally accepted in the United States of America.

**/s/ Mazars CPA Limited**
*Certified Public Accountants*
Hong Kong
March 29, 2011

127.    The 2011 Form 10-K contained a letter from Mazars, which stated:

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
**Telestone Technologies Corporation**

We have audited the accompanying consolidated balance sheets of Telestone Technologies Corporation and its subsidiaries (the "Company") as of December 31, 2011 and 2010, and the related consolidated statements of operations and other comprehensive income, changes in stockholders' equity and cash flows for each of the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial

reporting. Our audits included consideration of internal control over financial reporting as a basis for designing auditing procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. Our audits also included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2011 and 2010, and the results of its operations and its cash flows for each of the years then ended in conformity with accounting principles generally accepted in the United States of America.

**Mazars CPA Limited**
*Certified Public Accountants*
Hong Kong
March 30, 2012

128.     The Auditors' Reports included in the 2009 Form 10-K, 2010 Form 10-K, and 2011 Form 10-K were false and misleading because: (1) Mazars did not conduct its audits in accordance with PCAOB standards; (2)  Telestone's consolidated financial statements did not present fairly, in all material respects, either the financial position of Telestone and subsidiaries as of December 31, 2009, December 31, 2010, or December 31, 2011 or the results of their operations and their cash flows for each of the three years in the periods ended December 31, 2009, December 31, 2010, and December 31, 2011; (3) Telestone's financial statements were not presented in accordance with GAAP, rendering the Auditors' Reports not in compliance with PCAOB standards; and (4) the Auditor Reports were also false and misleading because Telestone's internal controls were not effective but were instead plagued by significant material weaknesses.

129.     Mazars recklessly issued its Auditor Reports, turning a blind eye to red flags such that it had insufficient evidence to support the recognition of revenue for purported sales to the Big

3 carriers in China; therefore, Mazars was reckless in stating that its audits were PCAOB-compliant and that Telestone's financial statements were presented in conformity with GAAP.

130.    An auditor is required to "assess audit risk and materiality ... in determining the nature, timing and extent of audit procedures and in evaluating the results of those procedures." Codification of Statements on Auditing Standards ("AU") §312.01.  In considering audit risk, "the auditor should specifically assess the risk of material misstatement of the financial statements due to fraud." AU §312.16.   If the auditor concludes that there is a heightened risk of material misstatement due to fraud or otherwise, he must take whatever steps are necessary to assure himself that the financial statements are not materially misleading. *See generally* AU §312 (requiring an auditor to limit audit risk to a low level, that is, a level appropriate for expressing an opinion on the financial statements). This is true in terms of the number and types of audit procedures he must perform, the time that he must spend on the audit, the number and experience of personnel that must be involved, and the level of supervision that should be employed. (AU § 312.17).  Mazars recklessly ignored the clear risks.

131.    In so doing Mazars failed to comply with the "Objectives" and "Standards" which guide its work as auditors.  For example, CON 1, *Objectives of Financial Reporting by Business Enterprises*, ¶16 states:

> The function of financial reporting is to provide information that is useful to those who make economic decisions about business enterprises and about investments in or loans to business enterprises. Independent auditors commonly examine or review financial statements and perhaps other information, and both those who provide and those who use that information often view an independent auditor's opinion as enhancing the reliability or credibility of the information.

132.    Mazars' Auditors' Reports for the years ending 2009, 2010 and 2011, all of which attest to Mazars' performance of its audits in accordance with the standards of the PCAOB and

Telestone's financial statements being presented in accordance with GAAP, were materially false and misleading when made, because:

a.　　Telestone's financial statements did not fairly present, in conformance with GAAP, the financial position of and results of operations for Telestone for the fiscal years represented in the Auditors' Reports.  Telestone was receiving minimal payments for its purported sales to the Big 3 in China but was continuing to recognize revenue on these transactions even as its accounts receivable and DSO ballooned.

b.　　Telestone's internal controls over financial reporting were not effective, and had serious material weaknesses that enabled Telestone's employees to manipulate the Company's financial reporting in order to make Telestone appear significantly profitable and with massive sales.[17]  Specifically, Telestone's lack of adequate internal controls prevented it from taking the necessary corrective actions to prevent or uncover the continuous and  improper recognition of revenue.

133.　　By issuing unqualified Auditors' Reports for these years, Mazars violated the standards of the PCAOB, which states:

> The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flow in conformity with generally accepted accounting principles.  This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards.  AU §508.07.

134.　　Mazars' reckless issuance of its Auditors' Reports not only allowed for the issuance of the false and misleading financial statements identified herein during the Class Period, but the fact

---

[17] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. PCAOB Auditing Standard No. 5, Par. A7.

that Telestone's financial statements had Mazars' imprimatur discouraged investors from questioning the accuracy of those statements.

135.    Additionally, Mazars was required to base its reports on evidence obtained during the audit, not the conclusions of management. "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02. "To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt or the auditor must express qualified opinion or a disclaimer of opinion." AU § 326.25.   Yet, even after the SEC had expressed extreme skepticism regarding Telestone's revenue recognition practices, Mazars continued to blindly support Telestone's position as demonstrated by its employees statements in the March 1, 2013 meeting with representatives of Telestone. *See* ¶56, *supra*.

## IX.    LOSS CAUSATION AND STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

136.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

137.    During the Class Period, as a result of the open, well-developed, and efficient market for Telestone's securities, the prices of Telestone's securities fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of Telestone's securities. Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Telestone's

securities price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

138.     The truth regarding Telestone's financial condition was partially revealed, and/or the concealed risks materialized, on or about: May 15, 2012; August 14, 2012, November 19, 2012; and April 17, 2013. As a direct result of these partial disclosures, the price of Telestone's stock declined precipitously on heavy trading volume.

139.     On May 15, 2012, the Company issued a press release announcing Telestone's 2012 fiscal first quarter financial results.  Therein, the Company disclosed that Telestone's accounts receivable was $256.5 million, that the accounts receivable turnover period (DSOs) had increased to 1,291 days, and that during the quarter, Telestone had only collected $14 million in accounts receivable.

140.     On this news, shares of Telestone declined $0.47 per share, 18.95%, to close on May 15, 2012 at $2.01 per share, on unusually heavy volume.

141.     On August 14, 2012, the Company filed its Q2 2012 Form 10-Q, in which it disclosed that Telestone's accounts receivable had even further increased to $259.5 million from $256.5 million in the prior quarter.

142.     On this news, shares of Telestone declined $0.12 per share, 8.51%, to close on August 14, 2012 at $1.29 per share, on heavy volume.

143.     On November 19, 2012,  the Company issued a press release announcing Telestone's 2012 fiscal third quarter financial results.  Therein, the Company disclosed that Telestone's accounts receivable was $243.9 million, that DSOs were 1,232 days, and that during the quarter Telestone had only collected $18.5 million in accounts receivable.

144.     On this news, shares of Telestone declined $0.24 per share, 14.81%, to close on November 19, 2012 at $1.38 per share, on unusually heavy volume.

145.     On April 17, 2013, the Company filed a Notification of Late Filing with the SEC on Form 12b-25/A.  Therein, the Company, in relevant part, stated:

> State below in reasonable detail the reasons why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.
>
> On April 2, 2013, Telestone Technologies Corporation (the "Company") filed a Form 12b-25 (the "Original 12b-25") disclosing that it was still in the process of compiling the information required to be presented in its Annual Report on Form 10-K for the year ended December 31, 2012 (the "2012 10-K") and would be unable to file the 2012 10-K within the prescribed period. In Part II of the Original 12b-25, the Company marked the box indicating the 2012 10-K would be filed within the fifteen calendar day grace period.
>
> At the time of the Original 12b-25 filing on April 2, 2013, the Company anticipated that the 2012 10-K would be filed no later than fifteen calendar days after its original due date. However, because of prolonged delays in the preparation of its financial statements required to be included in the Form 10-K, the Company will not be able to file the Form 10-K within the fifteen day extension period.
>
> Specifically, the Company is experiencing delays in obtaining certain necessary financial records from its Sichuan Ruideng subsidiary (the "Subsidiary Records Issue"). While the Company has completed the audit of the parent company, the records from Sichuan Ruideng are necessary to complete the audit of the Company's consolidated financial results.
>
> At this time, the Company plans to file the 2012 10-K as soon as the Subsidiary Records Issue has been resolved, the audit of the consolidated financial results has been completed and the information required to be included in the 2012 10-K has been fully compiled, disseminated and reviewed by the Company's management and Board of Directors.

146.     On this news, the NASDAQ halted trading in Telestone's securities. Subsequently, NASDAQ struck Telestone's listing. When Telestone's shares resumed trading on the over-the-counter market on June 3, 2013, the Company's stock price declined $0.54 per share, over 64%, to close on June 3, 2013 at $0.30 per share, on unusually heavy volume.

147.    During the Class Period, Plaintiff and the Class purchased Telestone securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

148.    The Individual Defendants and Mazars acted with scienter by virtue of: (a) their receipt of information reflecting the Company's improper revenue recognition; and/or (b) their failure to properly review the transactions prior to revenue recognition; and/or (c) their intentional issuance of materially false or misleading financial statements which prematurely and improperly recognized revenue on certain transactions; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so.  The Individual Defendants and Mazars knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

149.    The Individual Defendants and Mazars also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated.  The Individual Defendants and Mazars acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

### A.    Telestone Removes Its United States Based Auditor and Rehires Its Chinese Based Auditor Just Prior to the Start of the Class Period

150.    During the Company's fiscal years ended December 31, 2007 and 2008 and through July 8, 2009, the Company engaged Mazars CPA Ltd. as its independent registered public

accounting firm.  From July 9, 2009 through January 14, 2010, Telestone hired the QC CPA Group, LLC to review the Company's financial statements for the periods ended June 30, 2009 and September 30, 2009.  QC CPA Group, LLC resigned on January 14, 2010, and on January 18, 2010, Telestone again engaged Mazars CPA Ltd. as the Company's independent registered public accounting firm to audit the Company's financial statements for the year ended December 31, 2009.

151.    A representative of the Company claimed that Telestone switched back to Mazars because:

> …we found out that this new auditor [QC CPA Group] was not as familiar with our business and changes some of our ordinaries receivables as long term ones.
>
> Due to our high comfort level with our last time auditor, we switched back to Mazars and has been working to our traditional approved method of reporting receivables.

152.    Mazars was Telestone's auditor for all but a couple of quarters over the last half a decade.  As Telestone's long-time auditor, Mazars had unfettered access to Telestone's books and records, and it certainly had (or should have had) knowledge of GAAP and its requirements as an auditor.  Had Mazars conducted its audits properly, it would have reacted to the numerous, obvious "red flags" set forth above and, in so doing, would have discovered the truth about Telestone's operations and financial results. Instead, Mazars ignored those red flags and knowingly or recklessly failed to employ even the most basic procedures designed to detect fraud or to ensure that the financial statements were free from material misstatement.  Thus, in effect, Mazars abandoned its role as "independent auditor" and, in the process, knowingly or recklessly issued an unqualified audit opinion on Telestone's materially false and misleading financial statements, which had the effect of artificially inflating Telestone's stock price.

### B.     The Magnitude of the Transactions at Issue

153.    During the Class Period, almost all of the Company's purported revenue was derived from business with the Big 3.  Telestone earned 97.1%, 98.3%, 95.4%, and 99.1% of its revenues from the Big 3 for the years ended December 31, 2008, 2009, 2010 and 2011, respectively.  As of the nine months ended September 30, 2012, 84.3% of Telestone's revenues were from transactions with the Big 3.

154.    The magnitude and importance to the Company of these transactions supports an inference that the Individual Defendants and Mazars were aware of the terms of these contracts and details of these transactions.

### C.     The Lack of Adequate Sales Records and Refusal to Supply Its Sales Contracts

155.    On June 26, 2013, the SEC requested the following information from Telestone:

Please provide us with a schedule of accounts receivable by year from January 1, 2009 through September 30, 2012. Provide also cash collection information subsequent to September 30, 2012. Your schedule should identify for us the following information by individual final signed sales contract:
•       The name of the customer,
•       The date the final sales contract was signed,
•       The amount due under the contract and receivable from your customer upon signing of the final sales contract,
•       The contractual terms of remittance (such as amounts due in 30 days, 90 days, 180 days as applicable),
•       Amounts and dates of payments made per (tied to) final signed sales contract, and
•       If there are amounts that have not been paid, please explain to us, by individual sales transaction, the reasons why on a contract by contract basis.

156.    On July 17, 2013, Telestone responded in a letter signed by Defendant Han.  Therein, Telestone refused to provide the requested information on the grounds that: "According to our non-disclosure agreements with our customers, Telestone does not have the right to release any data or material that may lead to the disclosure of customer information. Therefore, we are not allowed to offer the information in Comment 2."

157.    Thereafter, on December 11, 2013, Telestone further responded to the SEC, stating:

As per the above requirements, Telestone has organized a 10 person finance working group since early September and spent 2 months trying to reclassify and comb approximately 25,000 existing project contracts and relevant accounting documents from more than 160 carrier customers that are distributed in 26 provinces and cities, which has resulted in huge workload. Due to the huge amount of information and time constraints involved, we are offering more detailed accounting records relevant to parts of your comment as follows, based on our best understanding of your requirements.

In the quarterly report on Form 10-Q for the third quarter of the 2012 fiscal year, we stated that as of September 30, 2012 net accounts receivable was $243,913,000 or RMB1,544,730,000 (using a U.S. dollar to Chinese RMB exchange rate of 1 to 6.33312223).

In the table below we have broken down our accounts receivable balance by provincial branches under the "Big 3 carriers". The table contains the data of the Company and its subsidiaries Beijing Telestone Wireless Telecommunication Company Limited, Beijing Telestone Communication Technology Corp. Ltd and Sichuan Ruideng.

158.    The fact that Telestone needed ten people to work two months to provide a simple chart containing the name of the customer, the date of the sales contract, the amount due and other contract terms, and the reason, if any, for non-payment, demonstrates that Mazars had completely negated its auditing responsibilities. This information is so basic that the lack of it should have been a red flag that Mazars picked up on during its audit.

## XI.    CLASS ACTION ALLEGATIONS

159.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Telestone securities between March 31, 2010 and April 16, 2013, inclusive (the "Class Period"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

160.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Telestone's securities were actively traded and quoted on the NASDAQ, a highly efficient marketplace.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Hundreds of thousands of Telestone shares were traded publicly during the Class Period, demonstrating an active and broad market for Telestone securities and permitting a strong presumption of an efficient market. Record owners and other members of the Class may be identified from records maintained by Telestone or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

161.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

162.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

163.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, management, and prospects of Telestone; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

164.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   UNDISCLOSED ADVERSE FACTS

165.    The market for Telestone securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, Telestone securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Telestone securities relying upon the integrity of the market price of the Company's securities and market information relating to Telestone, and have been damaged thereby.

166.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Telestone securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and/or omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about the Company, its business, operations, management, and prospects, as alleged herein.

167.    At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Telestone's operations and financial performance. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its operations and financial performance, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

168.    The market for Telestone securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Telestone securities traded at artificially inflated prices during the Class Period.

169.    Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Telestone securities and market information relating to Telestone, and have been damaged thereby. On March 31, 2010, the Company's stock closed at a Class Period high of $17.50 per share. During the Class Period, the artificial inflation of Telestone's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Telestone's operations and financial results. These material misstatements and/or omissions created an unrealistically positive assessment of Telestone and its business, operations, management, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed

negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

170.    At all relevant times, the market for Telestone securities was an efficient market for the following reasons, among others:

a.    Telestone stock met the requirements for quotation and/or listing, and was quoted and/or listed and actively traded and/or quoted on the NASDAQ, a highly efficient marketplace;

b.    As a regulated issuer, Telestone filed periodic public reports with the SEC;

c.    Telestone regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Telestone was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

171.    As a result of the foregoing, the market for Telestone securities promptly digested current information regarding Telestone from all publicly available sources and reflected such information in Telestone's stock price. Under these circumstances, all purchasers of Telestone securities during the Class Period suffered similar injury through their purchase of Telestone securities at artificially inflated prices and a presumption of reliance applies.

## XIV.   NO SAFE HARBOR

172.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Telestone who knew that the statement was false when made.

## XV.   COUNTS

**COUNT I**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

173.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

174.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Telestone securities at artificially inflated prices.  In furtherance of

this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

175.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Telestone securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

176.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Telestone's financials, business, operations, management, and prospects, as specified herein.

177.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Telestone's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Telestone and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

178.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

179.     The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Telestone's business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's operations and financial results throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

180.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Telestone securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Telestone securities during the Class Period at artificially high prices and were damaged thereby.

181.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Telestone was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Telestone securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

182.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

183.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
## Violation of Section 20(a) of
## The Exchange Act Against the Individual Defendants

184.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

185.    The Individual Defendants acted as controlling persons of Telestone within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

186.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

187.    As set forth above, Telestone and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**XVI.        PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all claims triable.

Dated: August 17, 2015                    Respectfully submitted,

                                          CARELLA, BYRNE, CECCHI,
                                          OLSTEIN, BRODY & AGNELLO, P.C.

                                          By:   */s/ James E. Cecchi*
                                          James E. Cecchi
                                          Donald A. Ecklund
                                          5 Becker Farm Road
                                          Roseland, New Jersey 07068
                                          (973) 994-1700

                                          GLANCY PRONGAY & MURRAY LLP
                                          Lionel Z. Glancy
                                          Robert V. Prongay
                                          Casey E. Sadler
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, California 90067
                                          Telephone:  (310) 201-9150
                                          Facsimile:   (310) 201-9160

                                          *Attorneys for Lead Plaintiff Bin Qu*